# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MINNESOTA

| | |
|---|---|
| Lamplighter Village Apartments LLLP, 1023 Grand Avenue LLC, 1708 and 1712 Grand Avenue LLC, 1947 Grand Avenue LLC, 231 Dayton Avenue LLC, 707 and 711 Grand Avenue LLC, Alton-SHN, LLC, Alton-NFLP, LLC, and Alton-HRG, LLC, Highland Ridge, LLLP, Lucas Goring, Madison LLC, Minnehaha Avenue Apartments, LLC, Oaks Union Depot LLC, Oxford Apartments LLC, Plaza, LLLP, Rockwood Place, LP, Wellington-NFLP, LLC, Wellington-PFP, LLC, Wellington-SHN, LLC, Woodstone Limited Partnership, and Yea Thao, | : : : : : : : : : : : : : : : |
| Plaintiffs, | : |
| | : |
| v. | : |
| | : |
| CITY OF ST. PAUL, | : |
| | : |
| Defendant. | : |

CIVIL ACTION NO. _____

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

**DEMAND FOR JURY TRIAL**

## INTRODUCTION

1.      This civil rights action addresses the unconstitutionality of an ordinance Defendant City of St. Paul (the "City") recently enacted that takes away the fundamental right of owners, managers, and operators of apartment and other private multifamily housing (collectively, "Owner(s)") to decide who will be entitled to reside in their property.

2.      Section 193.04 of St. Paul Ordinance 20-14 (the "Ordinance"), pertaining to "Applicant screening guidelines for prospective tenants," prohibits Owners evaluating rental applications from considering criteria that help predict whether applicants will successfully meet their rental obligations and whether they will create a security risk, including prior major felony convictions (such as for murder and arson), credit scores, and past rental history.

3.      Section 193.05 of the Ordinance, pertaining to "Just cause notice for tenants," dictates and severely limits the grounds on which an Owner may elect to terminate or non-renew a tenancy.

4.      Finally, Section 193.06 of the Ordinance, pertaining to "Advance notice of sale (of affordable housing)," requires Owners to notify the City and their tenants 90 days before taking any action to try to sell their privately-owned property.

5.      The Ordinance acts to appropriate Owners' property to advance some unarticulated societal purpose.  In doing so, it violates fundamental and inalienable rights enshrined in the Fifth Amendment to the United States Constitution and Article I, Section

13 of the Minnesota Constitution that prohibit the taking of private property for public use without just compensation.

6.     The Ordinance deprives Owners of substantive and procedural due process of the Fourteenth Amendment of the United States Constitution and Article I, Section 7 of the Minnesota Constitution by imposing restrictions upon fundamental property rights that do not substantially or even rationally advance some discernible, legitimate state interest, without constitutionally adequate process of law.

7.     Furthermore, the Ordinance impermissibly compels Owners to speak in violation of the First Amendment of the United States Constitution and Article I, Section 3 of the Minnesota Constitution by forcing them to follow a specified script when considering applicants, include certain dictated language in their private leases, and provide specified notice to the City and tenants in advance of the sale of their private property.

8.     Finally, the Ordinance is overly vague and fails to inform Owners how to comply with its new requirements, in violation of the Fourteenth Amendment of the United States Constitution and Article I, Section 7 of the Minnesota Constitution.

## **PARTIES**

9.     Plaintiff Lamplighter Village Apartments LLLP is a Minnesota limited liability limited partnership that owns one hundred fifty (150) residential rental units, including affordable housing units, located at 1512 Woodridge Street North in St. Paul and is subject to the Ordinance.

10.     Plaintiff 1023 Grand Avenue LLC is a Minnesota limited liability company that owns ten (10) residential rental units located at 1023 Grand Avenue in St. Paul and is subject to the Ordinance.

11.     Plaintiff 1708 and 1712 Grand Avenue LLC is a Minnesota limited liability company that owns eighteen (18) residential rental units located at 1708 and 1712 Grand Avenue in St. Paul and is subject to the Ordinance.

12.     Plaintiff 1947 Grand Avenue LLC is a Minnesota limited liability company that owns twenty (20) residential rental units located at 1947 Grand Avenue in St. Paul and is subject to the Ordinance.

13.     Plaintiff 231 Dayton Avenue LLC is a Minnesota limited liability company that owns twenty (20) residential rental units located at 231 Dayton Avenue in St. Paul and is subject to the Ordinance.

14.     Plaintiff 707 and 711 Grand Avenue LLC is a Minnesota limited liability company that owns eighteen (18) residential rental units located at 707 and 711 Grand Avenue in St. Paul and is subject to the Ordinance.

15.     Plaintiff Alton-SHN, LLC, Alton-NFLP, LLC, and Alton-HRG, LLC are Minnesota limited liability companies that own sixty-five (65) residential units located at 1306 Alton Street in St. Paul and is subject to the Ordinance.

16.     Plaintiff Highland Ridge, LLLP is a Minnesota limited liability limited partnership that owns two hundred twenty-eight (228) residential rental units located at 2285 Stewart Avenue in St. Paul and is subject to the Ordinance.

4

17.     Plaintiff Lucas Goring is a resident of the State of Minnesota who owns one (1) residential rental unit located at 776 Fairview Avenue North in St. Paul and is subject to the Ordinance.

18.     Plaintiff Madison LLC is a Minnesota limited liability company that owns fifty-three (53) residential rental units located at 1305 Madison Street in St. Paul and is subject to the Ordinance.

19.     Plaintiff Minnehaha Avenue Apartments, LLC is a Minnesota limited liability company that owns nine (9) residential rental units located at 1522 Grand Avenue in St. Paul and is subject to the Ordinance.

20.     Plaintiff Oaks Union Depot LLC is a Minnesota limited liability company that owns seventy (70) residential rental units located at 244 East 4th Street in St. Paul and is subject to the Ordinance.

21.     Plaintiff Oxford Apartments LLC is a Minnesota limited liability company that owns five (5) residential rental units located at 269 Oxford Street North in St. Paul and is subject to the Ordinance.

22.     Plaintiff Plaza, LLLP is a Minnesota limited liability limited partnership that owns one hundred two (102) residential rental units located at 2353 Youngman Avenue in St. Paul and is subject to the Ordinance.

23.     Plaintiff Rockwood Place, LP is a Minnesota limited partnership that owns one hundred sixty-eight (168) residential rental units, including Section 8 units, located at 2259 Rockwood Avenue in St. Paul and is subject to the Ordinance.

24.     Plaintiff Wellington-PFP, LLC, Wellington-SHN, LLC, and Wellington-NFLP, LLC, are Minnesota limited liability companies that own one hundred twenty (120) residential rental units located at 2235 Rockwood Avenue in St. Paul and is subject to the Ordinance.

25.     Plaintiff Woodstone Limited Partnership is a Minnesota limited partnership that owns one hundred fifty-four (154) residential rental units located at 2335 Stewart Avenue in St. Paul and is subject to the Ordinance.

26.     Plaintiff Chue Kue is a resident of the State of Minnesota who owns seven (7) residential rental units, including Section 8 units, located at 1654 Sherwood Avenue; 2602, 2604, 2606, 2608 Ruth Street;, and 65, 67 Kipling Street in St. Paul and is subject to the Ordinance.

27.     All of the above-referenced Plaintiffs are Owners in St. Paul.

28.     Defendant City of St. Paul is a Minnesota municipal corporation located in Ramsey County, Minnesota, subject to suit pursuant to Minnesota Statute § 412.211.  The City is a charter city, established pursuant to Chapter 410 of the Minnesota Statutes and Article XII, Section 4 of the Minnesota Constitution.  Its laws, including the Ordinance, are enacted by its City Council.  At all times relevant to this Complaint, the City was acting under the color of state law.

## JURISDICTION

29.     This Court has jurisdiction over this case pursuant to 28 U.S.C. §§ 1331 and 1343 because this case arises under 42 U.S.C. §§ 1983 and 1988 and the First, Fifth, and Fourteenth Amendments of the United States Constitution.

30.     This Court has supplemental jurisdiction under 28 U.S.C. § 1367 over Plaintiffs' other claims because the same case and controversy give rise to violations of the Minnesota Constitution.

31.     This Court is empowered by 28 U.S.C. §§ 2201 and 2202 to grant declaratory as well as other forms of relief, including permanent injunctive relief, necessary to remedy the alleged constitutional violations.

## VENUE

32.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because the claims arose in this judicial district and Defendant is a municipal corporation located in this judicial district.

## FACTS COMMON TO ALL COUNTS

### A.     Tenant Assessment

33.     Each of the Plaintiffs owns real property located in the City of St. Paul in which they lease residential apartments.  Each of the Plaintiffs manages and operates this real property either directly or through agents such as property managers.

34.     Leasing property is a consequential act fraught with serious risks.  It involves the demise of a real property interest and grants the tenant the exclusive right to possess the property (subject to certain inspection and other rights) during the term of the tenancy.

35.     Tenants may and do default on their rent obligations because their income is insufficient to cover the lease payments, they incur excessive unrelated debt, are not fiscally responsible, or simply decide not to fulfill their obligations.

36.     Evicting a tenant is a time consuming, costly, difficult, and extended process given the nature of leases and rights afforded to residential tenants.  An eviction can cost an Owner several thousand dollars in costs and fees, not including the time and attention necessary to see the process through.  Additionally, the Owner is deprived of rent payments throughout the eviction process.

37.     High rates of default can be economically devastating to Owners.  When a tenant stops paying rent, an Owner may not be able to pay its mortgage or its real estate taxes, and there is no mechanism to suspend those obligations while awaiting rental payments.

38.     While in exclusive possession of property, tenants may significantly damage their premises.  The cost of remediating this damage often far exceeds the amount of any security deposits.

39.     Applicants may be antisocial, dishonest, or disruptive tenants and pose a danger to the personal safety of other tenants and management or maintenance personnel and prevent other tenants' quiet enjoyment of their premises.

40.     Owners also have a duty to address and prevent instances of disruptive criminal and nuisance conduct in their rental communities.  Other City ordinances and State statutes make it the responsibility of the *Owners* to prevent the commission of certain crimes and nuisances on the rental premises.

41.     While Owners pursue eviction of a disruptive tenant, they frequently remain a threat to the safety of other tenants and management and maintenance personnel and continue disruptive conduct.  Further property damage often occurs and unpaid rents

continue to mount during the eviction process. Owners rarely recover unpaid rents or reimbursement for property damage. Tenants may be judgment proof and it is otherwise impractical to recover against them.

42.     Owners naturally seek to screen prospective tenants to identify and attempt to filter out those individuals presenting too great a risk of default under the lease or engaging in disruptive, dangerous or illegal conduct.

43.     Owners use screening policies and procedures to identify high risk tenants.

44.     In the normal course of tenant screening, Owners and their property managers, particularly those owning and/or managing multiple properties, utilize matrices of predictive factors which are objectively applied to qualify applicants.

45.     One of the criteria Owners ordinarily consider is prior criminal convictions because prior criminal conduct can be predictive of antisocial or disruptive behavior, or the financial stability necessary to meet ongoing lease obligations. One of the obligations Owners typically include in their leases is that tenants and/or their guests shall not engage in criminal activity on the property.

46.     Owners typically obtain criminal background checks of applicants and reject those with criminal records inconsistent with their screening criteria. These rejections are made to promote the safety of other tenants and management and maintenance personnel, avoid property damage, provide a peaceful environment and limit the potential for tenant defaults.

47.     An applicant's credit history is also typically part of Owners' screening criteria. Owners obtain credit reports from third-party agencies that include a credit score

calculated through analytics validated to be predictive of consumers' likelihood of defaulting on their obligations.  Owners rely upon these credit scores, as well as other information in the credit report, in their overall evaluation of applicants.

48.     Applicants' prior rental history is also a widely-used screening criteria. That history is predictive of a tenant's likelihood of meeting their lease obligations, damaging the apartment, or posing a threat to other tenants, management or maintenance employees or other tenants' quiet enjoyment of their residences.

49.     Owners also seek to assure that applicants earn sufficient income after other expenses and obligations to provide funds adequate to meet their lease obligation.

50.     Many St. Paul Owners with a significant number of rental properties use a minimum income test requiring income equal to three (3) times the rent or higher ("3x Income Test").  If an applicant does not meet the 3x Income Test, the Owner might reject the application.

51.     Owners' screening matrices and other evaluations balance these factors.  In some instances, Owners accept a tenant just meeting or failing the criteria on the condition that an additional security deposit be provided to offset the higher risk the Owner accepts.

## B.     **Sale of Private Multifamily Residential Properties**

52.     In addition to having dominion over to whom they rent their properties, Owners in St. Paul also have absolute control over the sale of their properties.

53.     The sale of apartment buildings and multifamily residential properties operates in the free market where sellers can choose to whom they wish to sell their properties, when, and at what price.

**C.     The St. Paul Ordinance**

54.     In July 2020, the St. Paul City Council sought to end Owners' long-held right to control access to their property free from government interference through the enactment of the Ordinance, which becomes effective in March 2021.  (A true and correct copy of the Ordinance is attached as Exhibit "A").

55.     The Ordinance controls and imposes substantial limitations on the criteria Owners may consider in screening applicants, terminating leases at their expiration, and selling their properties.

**1.     Prospective Tenant Screening Guidelines**

56.     Section 193.04 of the Ordinance governs "Applicant screening guidelines for prospective tenants" (the "Screening Ordinance").

57.     The Screening Ordinance provides that, before accepting applications for rental housing, an Owner "must provide written rental screening criteria to all applicants."

58.     The Screening Ordinance mandates that Owners "must apply uniform screening criteria" and "cannot disqualify an applicant" for certain reasons, including the applicant's criminal history, credit score, and/or rental history.

59.     With respect to criminal history, the Screening Ordinance provides that an Owner may *not* reject an applicant for various reasons, including:

11

g.  Any misdemeanor, gross misdemeanor or felony conviction stemming from the following traffic offenses: reckless driving, driving without a license, driving with a suspended or revoked license, and DUI that did not result in additional charges for injury to a person;

h.  Any conviction for misdemeanor or gross misdemeanor offenses for which the dates of sentencing are older than three (3) years;

i.  Except as provided in paragraph (j) below, any criminal conviction for felony offenses for which the dates of sentencing are older than seven (7) years; however, a landlord may deny an applicant who has been convicted of the illegal manufacture or distribution of a controlled substance as defined in section 102 of the Controlled Substances Act (21 U.S.C. 802), or for those same offenses that mandate denial of tenancy in federally assisted housing subject to federal regulations, including but not limited to when any member of the household is subject to a lifetime sex offender registration requirement under a state sex offender registration program;

j.  Any criminal conviction for the following felony offenses for which the dates of sentencing are older than ten (10) years: first-degree assault (Minnesota Statutes section 609.221), first-degree arson (Minnesota Statutes section 609.561), aggravated robbery (Minnesota Statutes section 609.245), first-degree murder (Minnesota Statutes section 609.185), second-degree murder (Minnesota Statutes section 609.19), third-degree murder (Minnesota Statutes section 609.195), first-degree manslaughter (Minnesota Statutes section 609.20), kidnaping (Minnesota Statutes section 609.25), or first-degree criminal sexual conduct (Minnesota Statutes section 609.342).

60.  With respect to credit history, the Screening Ordinance provides that an

Owner may *not* reject an applicant on the following bases:

a.  Credit score by itself; however, a landlord may use credit report information to the extent the report demonstrates a failure to pay rent or utility bills; or

b.  Insufficient credit history, unless the applicant in bad faith withholds credit history information that might otherwise form a basis for denial.

12

61.     Finally, with respect to rental history, the Screening Ordinance provides

that an Owner may *not* reject an applicant on the following bases:

a.      An eviction action pursuant to Minnesota Statutes Chapter 504 or
        other equivalents in other states, if the action occurred three (3) or
        more years before the applicant submits the application or if the action
        occurred during the three years immediately preceding submission of
        the application but did not result in a judgment entered against the
        applicant;

b.      Insufficient rental history, unless the applicant in bad faith withholds
        rental history information that might otherwise form a basis for denial;
        or

c.      If a landlord uses a minimum income test requiring an income equal
        to two and a half (2.5) times the rent or higher, the landlord must allow
        an exception to that test where the applicant can demonstrate a history
        of successful rent payment with the same or lower ratio of income to
        rent.

62.     Coupled with the enactment of the screening guidelines for prospective

tenants is the City's inclusion in the Ordinance of Section 193.03, governing security

deposits, which prohibits an Owner from obtaining from a tenant more than a single

month's rent as a security deposit (the "Security Deposit Ordinance").  Where an Owner

is permitted to deny an applicant under the Screening Ordinance but nevertheless rents to

that applicant, the Owner may obtain from the tenant an additional payment not to exceed

one month's rent.

## 2.      Just Cause Notice of Termination

63.     Additionally, the City dictates and severely limits the grounds on which an

Owner may rely when choosing to terminate a tenancy or not renew a lease under Section

193.05 of the Ordinance (the "Just Cause Ordinance").

64.     According to the Just Cause Ordinance, absent specific circumstances dictated by the Ordinance, a tenant may choose to extend the lease in perpetuity.

65.     Specifically, the Just Cause Ordinance provides that an Owner may terminate a tenancy, including by non-renewal of the lease, *only* if it can establish (1) non-payment of rent, after notice and failure to cure; (2) repeated late payment of rent, of at least five out of twelve consecutive months; (3) material non-compliance with lease provisions, after notice and failure to cure; (4) the tenant's refusal to renew or extend, after written request from the Owner; (5) good-faith recovery of possession for residency by the Owner or a family member; (6) building demolishment and dwelling unit conversion; (7) rehab and renovation, after written notice and relocation assistance; (8) government order to vacate, after written notice and relocation assistance; (9) termination of employment where occupancy is conditioned upon employment; or (10) exceeding occupancy standards.

66.     Where any of the aforementioned grounds exist and an Owner terminates a tenancy, where notice is required by law, the Owner must provide written notice including the reasons for the termination and the facts in support of those reasons.

67.     Section 193.05 further states that all residential tenant leases must include dictated just cause language, stating:

> The landlord under this lease shall not unilaterally terminate or attempt to terminate the tenancy of any tenant unless the landlord can prove in court that Just Cause exists.  The reasons for Termination of Tenancy listed in the City of Saint Paul's Just Cause Notice (Sec. 193.05), and no others, shall constitute Just Cause under this provision.

68.     Section 193.09(b) of the Ordinance states that where an Owner terminates a tenancy and provides notice referencing Section 193.05 as the grounds for termination "without fulfilling or carrying out the stated reason for or condition justifying the termination," the Owner is liable to the tenant in a private right of action for damages equal to relocation assistance, costs of suit or arbitration, and attorneys' fees.

### 3.     Advanced Notice of Sale of Affordable Housing

69.     Furthermore, the Ordinance dictates the way in which an Owner may sell any affordable housing properties it owns (the "Advanced Notice of Sale Ordinance").

70.     Section 193.06 of the Ordinance, governing "Advance Notice of Sale (of affordable housing)," states that an Owner who intends to make "Available for Sale" any "Affordable Housing Building" must notify the Director of the Department of Planning and Economic Development (the "Director"), with notice in a form proscribed by the City.

71.     A property is "Available for Sale," according to the Ordinance, whenever there are negotiations to enter a purchase agreement, advertisement of the sale, entering into a listing agreement or posting a sign that the building is for sale.

72.     "Affordable Housing Building" is defined by the Ordinance as any single-family rental home or multiple-family rental housing building where at least twenty (20) percent of the units rent for an amount that is affordable at no more than thirty (30) percent of income to households at or below eighty (80) percent of area median income.

73.     The notice must be given to the Director no later than ninety (90) days prior to the property being made Available for Sale.

15

74.     The notice must also be given to all affected tenants no later than ninety

(90) days prior to the property being made Available for Sale, along with City-dictated

notice language.

**D.      <u>Enactment, Implementation, and Enforcement of the Ordinance</u>**

75.     The Ordinance was enacted in July 2020 and becomes effective March 1,

2021.

76.     Leading up to the enactment, the City purported to work closely with

Owners and other members of the residential rental community to come to terms or an

agreement on language for an Ordinance that was both effective and workable for all

involved parties.

77.     Plaintiffs and other Owners spent considerable amounts of time

corresponding and meeting with members of City Council to discuss the Ordinance and

its effect on Plaintiffs and other Owners.

78.     But when it came time to take a vote to pass the Ordinance, City Council

decided to put a limit on the number of attendees, instituting a so-called "lottery" process,

which allowed only twelve members of the public.  All twelve of those attendees raised

objections against the Ordinance.  However, there were countless other Plaintiffs and

other Owners who were not able to voice their opposition to the Ordinance at the public

meeting of the City Council.

79.     Section 193.13 of the Ordinance provides that the City will convene an

Implementation Task Force comprising tenants, landlords, and their advocates to propose

16

rules and an implementation plan for the Ordinance, including a plan for educating landlords and tenants about the provisions in the Ordinance.

80.    Though the City convened an implementation committee, that committee failed to create or execute any rules or implementation plan or create an outreach and engagement plan for landlords or tenants any time prior to the filing of this Complaint.

81.    The Ordinance carries strict enforcement guidelines.  Section 193.09 of the Ordinance provides that any Owner that fails to comply with the Ordinance's requirements is subject to criminal prosecution and administrative fines.

82.    The Ordinance also provides a private right of action for any tenant aggrieved by the Owner's alleged noncompliance, permitting the tenant to institute a civil claim seeking redress to the extent permitted by law.

**E.    The Ordinance's Unconstitutional Impact**

83.    By severely limiting the criteria Owners may use to evaluate prospective tenants and prohibiting the use of criteria Owners have historically used and wish to continue to use, the Ordinance takes away Owners' fundamental property rights by requiring Owners to surrender possession of their property to tenants they would otherwise exclude, including tenants who may endanger other tenants and employees of Owners or their management companies, and failing to compensate Owners for that taking.

84.    By requiring substantial advance notice and relocation assistance to tenants and imposing other burdens on sale of their property, the Ordinance interferes with Owners' rights to sell their private property and with their investment-based expectations.

17

85.     By severely and artificially limiting the members of the public, including Owners, who were allowed to speak at the City Council meeting where the Ordinance was finally considered and adopted, the City violated the due process rights of Owners and others to be heard concerning legislation that dramatically affected their fundamental rights.

86.     By dictating the content of Owners' communications with prospective tenants and tenants in the application and evaluation process, in the lease itself, in terminating the tenancy, and in selling or otherwise upgrading or changing the private property of the Owners, the City has violated Owners' right to free speech.

87.     By failing to adequately specify actions or omissions that might be deemed to be violations of the Ordinance and subjecting Owners to criminal penalties, administrative fines, and private civil liability, the City has violated Owners' right to due process.

88.     By dictating whether Owners can decline to renew a lease and imposing non-contractual duties on Owners, the Ordinance interferes with and impairs Owners' contractual relationships.  The Ordinance requires owners to publish and implement their screening criteria and dictates the application of virtually every one of those criteria.

89.     The Ordinance's screening guidelines dictate under what circumstances an individual's criminal past may disqualify an applicant, prohibit disqualifying applicants based solely on credit score or lack of credit history, and specify when adverse leasing experience may be considered.

90.     The Ordinance will force Owners to lease to tenants Owners reasonably believe present a higher risk to the safety of other tenants and a higher risk of damaging the premises and of violating or defaulting on their lease obligations.

91.     In providing that conviction of crimes may not be considered within a specified time after the dates of sentencing, the Ordinance prohibits consideration of convictions that are highly predictive of the commission of additional crimes or other antisocial behavior and of a lack of the stability necessary to comply with a tenant's lease obligations.

92.     In prohibiting the consideration of convictions of serious felonies, such as first-degree murder, second-degree murder, third-degree murder, first-degree manslaughter, first-degree criminal sexual assault, kidnapping, first-degree arson, or first-degree assault more than ten (10) years after the "dates of sentencing," as a practical matter, the Ordinance prohibits Owners from considering that an applicant was only recently released from prison for one of these specified crimes.

93.     Assuming "dates of sentencing" (which is not clear) is the date a sentence was imposed by a judge, the date the Owner must consider is the date of that sentencing, not the date of release from incarceration for that sentence.  Thus, if an applicant is convicted of murder in 2011, sentenced in 2011, serves a 10-year sentence, and is released in 2021, the Owner cannot reject that applicant in 2021 based upon the 2011 murder conviction, but instead must accept that applicant before they have had an opportunity to re-assimilate into society and while they are most likely to commit another crime.

94.     The Ordinance also mandates that an Owner cannot reject an applicant for any other felony conviction (other than manufacture/distribution of certain controlled substances or for someone subject to a lifetime sex offender registration) for which the "dates of sentencing" is older than seven (7) years. If "dates of sentencing" means date of imposition of sentence by a judge, an Owner must rent to an applicant who has committed burglary, second-degree manslaughter, second-degree assault, second-degree arson, or vehicular homicide, including multiple offenses for any combination of those crimes over any period of time, so long as the last sentencing for one of those crimes occurred seven (7) years prior to the application.

95.     Under this mandate, if an applicant is convicted of second-degree manslaughter in 2014, sentenced in 2014, serves a seven (7) year sentence, and is released in 2021, the Owner cannot now reject that applicant based upon the 2014 manslaughter conviction, even though the applicant has only recently been released from prison.

96.     The Ordinance mandates that an Owner cannot reject an applicant for *any* misdemeanor or gross misdemeanor conviction for which the "dates of sentencing" is older than three (3) years. If "dates of sentencing" means date of imposition of sentence by a judge, an Owner must rent to an applicant who committed, for example, fifth-degree assault, prostitution or solicitation thereof, criminal trespass, domestic assault, theft, disorderly conduct, possession of dangerous weapons, or public nuisance, including multiple convictions for any combination of those criminal offenses, so long as the sentencing for the last of those crimes occurred three (3) years ago.

97.     Under this mandate, if an applicant has been convicted of and sentenced for domestic assault or recklessly using a gun or explosives as a tenant in a way that endangered the safety of others or is convicted of disorderly conduct for throwing loud parties multiple times over an extended period ending in 2018, the Owner cannot reject that applicant based upon those convictions.

98.     Under this mandate, if an applicant has been convicted of a dozen DWI violations in the year before presenting the application, with the last conviction only days before the application is submitted, the Owner cannot reject that applicant based on those multiple, recent convictions.

99.     Read together, these mandates of the Ordinance require Owners to rent to individuals who have been convicted of, sentenced, and incarcerated for serious crimes that are particularly concerning for Owners creating safe living environments for their tenants.

100.    The Ordinance fails to take into account that one individual could be convicted of multiple crimes, rendering him or her even more dangerous to the rental community.  For example, if an individual was convicted of murder, criminal sexual assault, *and* armed robbery and sentenced for those crimes over ten (10) years ago, the Ordinance requires the Owner to rent to that individual, regardless of the inherent danger in doing so.

101.    The same is true for less serious crimes.  For instance, where an applicant has numerous misdemeanor convictions for running a house of prostitution over an extended period of time, but none less than three (3) years old, an Owner's concern is

elevated.  The Ordinance prohibits an Owner from evaluating a pattern of criminal misdemeanors stretching back more than three (3) years.

102.   Renting to individuals with convictions for serious crimes is a legitimate concern for Owners.  Indeed, the Ordinance requires Owners to rent to individuals it would otherwise be prohibited from employing under Minnesota Statutes Section 299C.68, known as the Kari Koskinen law.  The Ordinance puts Owners, their managers and employees, and other tenants in danger.

103.   An Owner may even be subject to civil damages actions and their attendant costs from other tenants and/or employees that are harmed as a result of the Owner's rental to a tenant with a known criminal history.  Forcing Owners to take on this risk puts them in a precarious legal position.

104.   Under the Ordinance, Owners can still run the same credit history report, but now *cannot* reject an applicant for certain information identified within that report.

105.   Specifically, an Owner may not reject an applicant for a "credit score by itself."

106.   Credit scores generated by reputable credit agencies have been objectively verified to predict accurately individuals' likelihood of meeting their financial obligations and are utilized by banks and other financial institutions and retailers in determining whether to extend credit.

107.   Credit scores are also reported on a scale and the Ordinance prohibits Owners from excluding applicants based on credit scores no matter how low.

108.   To make matters worse, the City is requiring Owners to turn a blind eye to credit history information without permitting Owners to take any extra security deposit to cover any risk it incurs in renting to a tenant with poor or insufficient credit history.

109.   Under the Ordinance, Owners can still request rental history information, but now *cannot* reject an applicant for certain rental history information.

110.   An Owner may only reject an applicant based on an eviction if it occurred less than three (3) years prior to submission of the application.

111.   Owners may not consider an eviction occurring more than three (3) years before an application is submitted, even if the applicant had not successfully rented property in the interim.  For example, owners could not consider multiple evictions if the applicant had lived the last three (3) years at his or her parents' residence.  This is true even if the eviction was the result of unlawful conduct, breach of the lease, damage to the property, or even terrorizing neighbors and staff.

112.   Under the Ordinance, an Owner may no longer require that applicants satisfy the 3x Income Test, but must instead accept any applicant who can demonstrate successful payment of rent with income less than *two and a half (2.5x)* times the rent (the "2.5x Income Test").

113.   Even where an applicant fails the 2.5x Income Test, the Owner must allow an exception where the applicant can demonstrate "a history of successful rent payment with the same or lower ratio of income to rent."

114.   After forcing Owners to lease to tenants presenting a higher risk to other tenants and a higher risk of damaging the premises and defaulting on lease obligations,

23

the Ordinance then handcuffs Owners by eviscerating their ability to terminate a lease at the end of its contractually agreed term.

115.    Rather than permitting an Owner to decide whether or not to keep a tenant, the Just Cause Ordinance requires an Owner to have specific grounds, dictated by the City, for terminating the tenancy.  In doing so, the Ordinance requires Owners to continue to allow individuals to remain in possession of their property when Owners would otherwise require the individuals to vacate.

116.    Repeated delays in rent payments impose additional costs upon Owners even if they do not meet the Ordinance's threshold of occurring five (5) times in twelve (12) consecutive months.  Further, tenants' failure to maintain their properties, holding loud parties, and/or repeated minor infractions of applicable rules and requirements impose further enforcement burdens upon Owners and annoy neighboring tenants whether or not they rise to the level of material breach of the lease.  Owners have every right to elect to discontinue dealing with tenants engaging in this type of conduct.

117.    By way of example, if a tenant commits a violent crime, such as domestic abuse, during the tenancy, it appears that the Owner must renew that tenant's lease, so long as the tenant pays most, but not all, of his or her rent and the tenant "cures" his breach of the lease by not committing any additional violent crimes.

118.    Tenants often make confidential complaints about other tenants.  The complaint is often made confidentially for fear of retaliation by the tenant who is the subject of the complaint.  Thus, unable to establish public proof that would support an eviction, Owners often solve the problem by deciding not to renew a lease.  The

Ordinance would make such a solution impossible unless an Owner was willing to betray the innocent tenants by putting their confidential complaints in writing and sending the description of the complaints to the problem tenant.

119.    Section 193.05(a)(3) purports to allow an Owner to terminate or non-renew a tenant who materially breaches the lease, but only if the Owner first provides the tenant written notice of the breach and, even then, only if the tenant "continues, or fails to Cure the Deficiency."

120.    A tenant is deemed to have Cured the Deficiency if the tenant "fully complies with . . . notice to cease an activity that is in violation of the lease."

121.    Thus, if an Owner discovers that a tenant has punched holes in every wall in his unit, an Owner must give the tenant written notice that such action is a material breach of the lease.  If the tenant then stops punching holes in the walls, the tenant cannot be evicted because the tenant has Cured the Deficiency and no Just Cause exists under the Ordinance.

122.    The same is true if a tenant has threatened or deliberately scared other tenants, was repeatedly and disturbingly loud, damaged common areas of the building, propped open outside doors that were supposed to remain locked, or violated the lease in other ways.  In each case, the Ordinance requires written notice to the tenant that the activity is a material breach of the lease and the Owner may only take action against the tenant if the tenant does the same activity *again* after the notice.

123.    Even if the tenant violates the lease in the same way *again* after written notice, rather than simply non-renewing the lease at the end of the lease term, the Owner

will be required to engage in the time-consuming and expensive process of instituting an eviction proceeding. This provision will increase the number of eviction proceedings necessary for Owners to rid their properties of problematic tenants.

124. This is burdensome not only on the Owner, but also on the tenant who must defend against the eviction proceeding and carry with him or her an eviction on record when trying to find housing in the future.

125. The cumulative effect of the Ordinance's various provisions severely cripples an Owner's ability to avoid problem tenants and protect its other tenants, and is also profoundly unfair to applicants with exemplary records.

126. Under the Ordinance, an Owner in 2021 is prohibited from making any distinction between Applicant A, who has never committed a crime, has never been evicted, has a high credit score of 800 and an income five (5) times higher than the rent, and Applicant B, who was convicted of first degree pre-meditated murder in 2009, convicted of second-degree manslaughter for a separate killing in 2012, convicted a number of times of running a house of prostitution with the latest conviction in 2016, evicted numerous times with the latest eviction in 2016, and has a low credit score of 425. And, once Applicant B is accepted and begins either not fully paying rent on time and/or causing a nuisance on the premises, the Owner must continue to renew that tenant's lease at the expiration of the lease period or undergo the expensive and time-consuming eviction process if and only if the Owner can establish Just Cause under the Ordinance and the tenant fails to Cure The Deficiency.

127.    The Ordinance further impacts Owners by dictating how and when they can sell their privately-owned property.  When seeking to sell a privately-owned Affordable Housing Building, at the first inclination of a potential sale, the Owner must give notice of that potential sale to the City.  The Owner must then wait at least ninety (90) days before completing the sale.

128.    Where a sale of this type can typically be effectuated in as little as thirty (30) days, the Ordinance delays the pending sale by at least ninety (90) days.

129.    During that ninety (90) day time period, the volatile financing market can change drastically, resulting in higher interest rates significantly impacting the sale.  This will diminish the value of the property being sold, at a significant financial detriment to the Owner selling it.

**F.    The City of St. Paul Offers No Clear or Valid Justification for the Ordinance**.

130.    Many of the findings in the Ordinance relate to the need for safe, affordable rental housing in St. Paul.  The Ordinance does not include any assertion that it will increase the availability of safe, affordable rental housing in St. Paul.  In fact, the effect of the Ordinance will be to decrease the availability of such housing.

131.    Many of the findings recite national or state-wide statistics, without any explanation how those statistics might relate to the population of St. Paul or, more specifically, the population of rental housing applicants in St. Paul.

132.    Furthermore, many of the findings, such as that "[c]redit score itself does not reflect positive rental history or timely rent payments or probability of on time rent

payments," are both inaccurate and unaccompanied by any indication of the basis for the finding.

133.    The City relied in part upon a January 2019 non-profit housing study conducted in partnership with Wilder Research entitled "Success in Housing: How Much Does Criminal Background Matter?," authored by Cael Warren (the "Wilder Study").

134.    However, the Wilder Study focused on individuals who committed less serious crimes and focused on the narrow question of whether or not a person with a criminal record will commit the same or similar crime in the future.  The crimes studied were less serious than those addressed by the Ordinance and the study failed to take into account individuals with multiple criminal convictions over a period of time.

135.    Moreover, the Wilder Study focused predominately on properties offering a high level of supportive services to tenants, increasing their likelihood of a successful tenancy.  While such services are provided by the non-profit housing providers studied, they are not provided by the for-profit Owners of market-rate housing governed by the Ordinance.

136.    In addition, the Wilder Study analyzed whether the households whose tenants had prior minor criminal convictions had a higher failure rate than a 17% baseline failure rate.  Plaintiffs could not financially survive if they experienced a 17% failure rate.  The Wilder Study says nothing about whether renting to individuals with criminal records, including for violent crimes, in private buildings with no supportive services would materially increase the failure rate Plaintiffs actually experience.

137.    Cael Warren, the author of the study, himself publicly announced: "While this study offers some rare insights into the relationship between criminal background and success in housing, there is still a great deal that we don't know.  For example: 1. We don't know if the results above can be applied to the rental population as a whole. . . .  2. We couldn't control for everything that contributes to housing outcomes, and we don't know how much that affects our results. . . .  3. We're not sure whether or how the impact of a given type of criminal background differs when a household committed more than one offense of that type. . . .  4. We don't know the impact of every kind of criminal background."  (*See* Cael Warren, "Criminal Background's Impact on Housing Success: What We Know (And What We Don't)," 7/16/19, attached as Exhibit "B").

138.    Moreover, the Ordinance states that the dates the Owner must consider are the "dates of sentencing."  If this means the date the judge imposed the sentence as opposed to the date of release from incarceration, this renders all research analyzing recidivism from the date of release largely irrelevant.

139.    The Wilder Study does not support the serious impositions placed on Owners by the Ordinance.

140.    In fact, offenders with criminal convictions have a high rate of recidivism, and it can take a significant amount of time for an offender to reach non-offender status.

141.    For example, in April 2014, the U.S. Department of Justice, Office of Justice, Bureau of Justice Statistics released a Report of a Study entitled "Recidivism of Prisoners Released in 30 States in 2005: Patterns from 2005 to 2010."  (A copy of the Report is attached as Exhibit "C").

142.    The U.S. Department of Justice reported that about two-thirds (67.8% ) of released prisoners were arrested for a new crime within three (3) years, and about three-quarters (76.6%) were arrested within five (5) years.

143.    In May 2019, the U.S. Department of Justice released another Report of a Study entitled "Recidivism of Sex Offenders Released from State Prison: A 9-Year Follow-Up (2005-14)."  (A copy is attached as Exhibit "D").

144.    The U.S. Department of Justice reported that about half (1/2) of released sex offenders had a subsequent arrest that led to a conviction.

### G.    The Ordinance Does Not Achieve the City's Stated Goals.

145.    To the extent the Ordinance seeks to create or provide more affordable housing in St. Paul, it does not do so.  To the contrary, the Ordinance will *increase* the cost of doing business, leading to higher rents charged to tenants.  Renting to tenants with low or non-existent credit scores, less than 2.5x income, and/or a history of evictions will lead to a higher rent default rate.  The more defaults, the less income for Owners, and the more they have to spread those costs to their other tenants through increased rents.

146.    The same is true for property damage by tenants.  Renting to tenants with serious criminal records and poor rental histories will increase the instances of property damage.  The more property damage, the more Owners have to spend on the properties, leading to increased rents.

147.    Even if the Ordinance did not result in increases in rent, it would not create additional affordable housing to remedy the shortage of such housing in St. Paul.  Because it will not increase the amount of affordable housing, the Ordinance simply

reallocates existing affordable housing, taking it away from applicants with little or no criminal history, few or no evictions, and good credit scores and allocating it instead to applicants with serious criminal histories, past evictions, and low or nonexistent credit scores.

148.    Additionally, the inability to rent to whom one chooses as well as the inability to buy and sell rental properties in the free market will lead at least some Owners and developers to either cease doing business in St. Paul or not enter the market in the first place, providing less housing overall.

### H.    The Ordinance is So Vague and Ambiguous that it is Impossible for an Owner to be Certain of Compliance.

149.    To complicate matters even further, the Ordinance is so vague and ambiguous that proper compliance is impossible.

150.    By way of example, Sections 193.04(b)(1)(h), (i), and (j) of the Ordinance require the Owner to evaluate an applicant's criminal history record from the "dates of sentencing" for crimes committed.  The phrase "dates of sentencing" is not clear because it could be interpreted to mean the date the sentence was imposed, the date the sentence began to run, the date the sentence ended, or some other date.  This lack of clarity makes it impossible for an Owner to determine what date to use to evaluate an applicant's criminal history to comply with the Ordinance.

151.    Furthermore, it is unclear what criminal convictions for felony offenses are excluded from the Ordinance based on mandated denial of tenancy in federally assisted housing programs.  Section 193.04(b)(1)(i) states that an Owner may not consider a

conviction for a felony offense for which the dates of sentencing are older than seven (7)

years unless that offense, *inter alia*, is one of "those same offenses that mandate denial of

tenancy in federally assisted housing subject to federal regulations . . . ."  The Ordinance

does not specify to which federally assisted housing program and/or federal regulations it

refers.  There is no guidance to the Owner to determine what criminal convictions fall

within this exception.  And, an Owner who does not own federally assisted housing

would have no reason to be familiar with the offenses that mandate denial of tenancy in

that housing.

152.   In addition, as also noted above, Section 193.04(b)(2)(a) states that an

Owner may not reject an applicant based on a low credit score "by itself" but may

consider information within a credit report to the extent it "demonstrates a failure to pay

rent or utility bills."  That language does not tell an Owner whether it may base a

rejection on a low credit score in conjunction with other information in the credit report

that is relevant to payment of rent or utility bills, or whether it is prohibited from basing a

rejection on a low credit score in all instances.

153.   Section 193.04(b)(3)(c) governing the income test permitted requires an

Owner to allow exceptions from the 2.5x Income Test where the applicant can

demonstrate "a history of successful rental payment" with a lower income.  There is no

definition or guidance for an Owner to determine what constitutes a "successful"

payment history.  In addition, there is no definition or guidance as to the length of time an

applicant must have had "successful rental payment" in order for it to constitute a

"history" under the Ordinance.

154.    Section 193.05(d), pertaining to the notice required by an Owner when terminating a tenancy, states that the notice is required "[w]ith any termination notices required by law," but does not provide any explanation of what termination notices are required by law nor does it cite to any of the laws to which it refers.  While Section 193.05(a) is entitled "Just cause notice," it lists circumstances in which an Owner "may *not* issue a notice terminating tenancy," not circumstances in which an Owner must issue such a notice.  The only provisions of the Ordinance that specifically require a termination notice are Section 193.05(a)(2) [notice to vacate for repeated late payment of rent], Section 193.05(a)(4) [notice to vacate after tenant refuses to renew lease], and Section 193.05(a)(7) [written notice to vacate for rehab and renovation].

155.    Section 193.05(d) also requires that an Owner provide the tenant with facts in support of the reasons for the termination.  The Ordinance does not explain or provide any examples of what facts are required – whether that be documentary or testimonial evidence.  It also does not advise Owners of what facts are sufficient support for the reason of termination.  A fact that the Owner thinks is sufficient to warrant non-renewal may not be satisfactory to the City, resulting in an unintended violation of the Ordinance.

156.    Section 193.06 pertaining to advance notice of sale of affordable housing is similarly vague.  The Advance Notice of Sale Ordinance requires an Owner to provide notice when the building is "Available for Sale," which is defined by a myriad of circumstances, including "negotiating to enter into a purchase agreement that includes an Affordable Housing Building."  It is not clear what actions must occur in order for it to be deemed that negotiations have commenced.  Those discussions could be as early as a text

message expressing interest, an oral discussion between two parties, or the commencement of drafting agreements of sale and conducting due diligence. It is not clear at what point the Owner must notify the City of the potential sale in order to remain in compliance with the terms of this provision.

157. Finally, Section 193.09 of the Ordinance governing enforcement of the Ordinance does not detail what penalties will be imposed for non-compliance with the Ordinance. Specifically, the Ordinance states that failure to comply "may result in criminal prosecution and/or administrative fines." It does not define what criminal penalties may be imposed, what administrative fines may be imposed, and/or what other remedies are available at equity or law.

158. The Ordinance itself acknowledges these problems, promising that "The Office of Financial Empowerment (OFE) shall convene an Implementation Task Force made up of tenants, landlords and their advocates *to propose rules and an implementation plan* for this chapter, *including a plan for educating landlords and tenants about the provisions in this section*." (Emphasis supplied).

159. That task force failed to create or execute any rules or implementation plan or create an outreach and engagement plan for landlords or tenants any time prior to the filing of this Complaint.

## CAUSES OF ACTION

### COUNT ONE
### Unconstitutional Taking
### U.S. Const. Amend. V, Amend. XIV and Minn. Const. Art. I, § 13
### 42 U.S.C. §§ 1983 and 1988, and 28 U.S.C. §§ 2201 and 2202

160.    Plaintiffs incorporate by reference the preceding paragraphs as if set forth at length herein.

161.    The Fifth Amendment of the United States Constitution, applicable to state action under the Fourteenth Amendment, and Article I, Section 13 of the Minnesota Constitution provide that private property shall not be taken for public use without just compensation.

162.    By enacting the Ordinance, the City has seized Plaintiffs' and other Owners' property without just compensation in violation of the Fifth Amendment of the United States Constitution and Article I, Section 13 of the Minnesota Constitution.

163.    If Plaintiffs and other Owners continue to lease their property to their choice of tenants, based upon all the information they deem necessary to determine the suitability and qualifications for their choice of tenants, and terminate tenancies in accordance with the terms of the lease when they deem necessary, Plaintiffs and other Owners will be in violation of the Ordinance.  The unstated goal of the Ordinance is to require Owners to lease their property to individuals to whom they would not otherwise allow access.

164.    Entry upon property without the voluntary consent of the owner is a physical invasion of property and a trespass.  The invasion is substantial in that the tenant

35

enjoys exclusive possession of the property over an extended period.  As such, forcing Owners to allow unwanted individuals to occupy their property is a physical taking.

165.    Where the government restricts a fundamental right intrinsic to landowners, there is an unconstitutional taking.

166.    Even if the Ordinance did not result in Owners renting to individuals they would otherwise exclude, dictating the screening criteria and how they may be applied substantially interferes with the right to control access to property.

167.    The Ordinance is not an exercise of the City's police or land use regulatory powers.  It does not address the safe use of apartments or provide for the orderly development of the City.  To the contrary, the Ordinance is plainly intended to use Owners' property to advance some unspecified societal purpose.  The burdens imposed are not extended to society as a whole and cannot be imposed without just compensation.

168.    The Ordinance imposes a significant economic burden on Plaintiffs and other Owners.

169.    The Ordinance diminishes the ability of Plaintiffs and other Owners to recover rent and make money on their investments in their properties.  The Ordinance diminishes the overall economic value of those properties.

170.    The Ordinance interferes significantly with Plaintiffs' and other Owners' investment-backed expectations for their property.  It radically changes the rental environment that existed when Plaintiffs entered the residential real estate market and invested, often millions, in acquiring rental properties.  Plaintiffs and other Owners expect that they have the ability to select their tenants of choice, on a non-discriminatory

basis, and to assess applicants on factors relevant to their suitability as tenants, including credit history, criminal history, and other factors. The Ordinance interferes with these expectations on which Plaintiffs and other Owners have made their investments.

171. The Ordinance further interferes with Plaintiffs' and other Owners' right to sell their privately-owned properties in a manner of their choosing, without regulatory interference by the City, and makes their properties less valuable to potential buyers.

172. By causing delays to any potential sales of Affordable Housing Buildings, the City's regulation forces Plaintiffs and other Owners to face the uncertainty of volatile market financing rates, leading to a diminution of the value of their properties.

173. Any governmental interests that precipitated the Ordinance may be achieved through less onerous means and in a way that respects Plaintiffs' and other Owners' fundamental property rights and places any burdens necessary to achieve those interests on society generally rather than solely on Plaintiffs and other Owners.

174. The City has failed to offer any just compensation or any method of seeking compensation for this taking.

175. These violations of the Fifth Amendment to the United States Constitution and Article I, Section 13 of the Minnesota Constitution give rise to both declaratory and injunctive remedies under 28 U.S.C. §§ 2201 and 2202.00.

176. Plaintiffs are entitled to a declaration from this Court that the Ordinance violates the Fifth Amendment of the United States Constitution and Article I, Section 13 of the Minnesota Constitution.

177.    Plaintiffs have no adequate remedy at law for the harm caused by the Ordinance.  Unless the City is enjoined from enforcing the Ordinance, Plaintiffs and other Owners will be irreparably injured, as they will be deprived of their rights under the United States Constitution and the Minnesota Constitution, will continue to suffer substantial loss of rents, profits, and good will, the nature and extent of which is impossible to ascertain, and will unnecessarily subject their tenants to unsafe situations.

**COUNT TWO**
**Substantive Due Process – Unconstitutional Deprivation of Property Rights**
**U.S. Const. Amend. XIV and Minn. Const. Art. I, § 7**
**42 U.S.C. §§ 1983 and 1988, and 28 U.S.C. §§ 2201 and 2202**

178.    Plaintiffs incorporate by reference the preceding paragraphs as if set forth at length herein.

179.    The Fourteenth Amendment of the United States Constitution and Article I, Section 7 of the Minnesota Constitution provide that states shall not deprive any persons of life, liberty, or property without due process of law.  U.S. Const. Amend. XIV; Minn. Const. art. I, § 7.

180.    The Ordinance deprives Plaintiffs and other Owners of their rights to due process under the Fourteenth Amendment of the United States Constitution and Article I, Section 7 of the Minnesota Constitution.

181.    Under the Due Process clause, Plaintiffs and other Owners are entitled to heightened protection against governmental interference with their fundamental right to liberty, including those fundamental rights and liberties which are objectively and deeply rooted in the Nation's history and tradition.  Such rights include property rights.

38

182.   A fundamental right inherent in the ownership of property is the right to exclude others from your property.

183.   By requiring Plaintiffs and other Owners to rent their properties to certain tenants without full consideration of that tenant's criminal history, credit, or rental history, and by prohibiting Plaintiffs and other Owners from terminating a tenancy on grounds they deem relevant, the Ordinance denies them their fundamental right to property and their fundamental right to exclude unwanted persons from their property.  If Plaintiffs and other Owners continue to lease their property to their choice of tenants, based upon all the information they deem necessary to determine the suitability and qualifications for their choice of tenants, they will be in violation of the Ordinance. Therefore, the City is mandating who may physically occupy Plaintiffs' and other Owners' property and impermissibly restricting their fundamental property rights.

184.   The Ordinance's deprivation of fundamental rights is not justified by any compelling governmental interest.

185.   The Ordinance is not narrowly tailored to serve any compelling governmental interest.

186.   The City's governmental interests are not achieved in any meaningful way by the Ordinance.

187.   The Ordinance violates Plaintiffs' and other Owners' due process rights.

188.   The Ordinance expressly mandates that Plaintiffs and other Owners must rent their properties to certain individuals, preventing them from using their properties in the manner they wish.

189.   The Ordinance is not rationally related to a legitimate government interest.

190.   These violations of the Fourteenth Amendment to the United States Constitution and Article I, Section 7 of the Minnesota Constitution give rise to both declaratory and injunctive remedies under 28 U.S.C. §§ 2201 and 2202.00.

191.   Plaintiffs are entitled to a declaration from this Court that the Ordinance violates the Fourteenth Amendment of the United States Constitution and Article I, Section 7 of the Minnesota Constitution.

192.   Plaintiffs have no adequate remedy at law for the harm caused by the Ordinance.  Unless the City is enjoined from enforcing the Ordinance, Plaintiffs and other Owners will be irreparably injured, as they will be deprived of their rights under the United States Constitution and the Minnesota Constitution, will continue to suffer substantial loss of rents, profits, and good will, the nature and extent of which is impossible to ascertain, and will unnecessarily subject their tenants to unsafe situations.

**COUNT THREE**
**Procedural Due Process – Unconstitutional Deprivation of Property Rights without Due Process of Law**
**U.S. Const. Amend. XIV and Minn. Const. Art. I, § 7**
**42 U.S.C. §§ 1983 and 1988, and 28 U.S.C. §§ 2201 and 2202**

193.   Plaintiffs incorporate by reference the preceding paragraphs as if set forth at length herein.

194.   The Fourteenth Amendment of the United States Constitution and Article I, Section 7 of the Minnesota Constitution provide that states shall not deprive any persons of life, liberty, or property without due process of law.  U.S. Const. Amend. XIV; Minn. Const. art. I, § 7.

195. The Ordinance deprives Plaintiffs and other Owners of their rights to procedural due process of law under the Fourteenth Amendment of the United States Constitution and Article I, Section 7 of the Minnesota Constitution.

196. Under the Due Process clause, Plaintiffs and other Owners are entitled to heightened protection against governmental interference with their fundamental right to liberty, including those fundamental rights and liberties which are objectively and deeply rooted in the Nation's history and tradition.  Such rights include property rights.

197. A constitutionally-protected, fundamental right inherent in the ownership of property is the right to exclude others from your property.

198. The City failed to provide Plaintiffs and other Owners with the opportunity to be heard at a meaningful time and in a meaningful manner when it elected to limit the number of attendees at the public meeting where the City Council voted to enact the Ordinance.  The City precluded a significant number of Plaintiffs and other Owners from voicing their opposition to the Ordinance in any meaningful way, depriving them of the opportunity to be heard.

199. The City deprived Plaintiffs and other Owners of their constitutionally-protected, fundamental rights without constitutionally adequate process.

200. The Ordinance's deprivation of fundamental rights is not justified by any compelling governmental interest.

201. The Ordinance is not narrowly tailored to serve any compelling governmental interest.

202.    The City's governmental interests are not achieved in any meaningful way by the Ordinance.

203.    The Ordinance is not rationally related to a legitimate government interest.

204.    These violations of the Fourteenth Amendment to the United States Constitution and Article I, Section 7 of the Minnesota Constitution give rise to both declaratory and injunctive remedies under 28 U.S.C. §§ 2201 and 2202.00.

205.    Plaintiffs are entitled to a declaration from this Court that the Ordinance violates the Fourteenth Amendment of the United States Constitution and Article I, Section 7 of the Minnesota Constitution.

206.    Plaintiffs have no adequate remedy at law for the harm caused by the Ordinance.  Unless the City is enjoined from enforcing the Ordinance, Plaintiffs and other Owners will be irreparably injured, as they will be deprived of their rights under the United States Constitution and the Minnesota Constitution, will continue to suffer substantial loss of rents, profits, and good will, the nature and extent of which is impossible to ascertain, and will unnecessarily subject their tenants to unsafe situations.

**COUNT FOUR**
**Unconstitutional Compelled Content-Based Speech**
**U.S. Const. Amend. I and Minn. Const. Art. I, § 3**
**42 U.S.C. §§ 1983 and 1988, and 28 U.S.C. §§ 2201 and 2202**

207.    Plaintiffs incorporate by reference the preceding paragraphs as if set forth at length herein.

208.   Plaintiffs and other Owners have the right, under the First Amendment of the United States Constitution and Article I, Section 3 of the Minnesota Constitution to control the content of their speech and to not be compelled to speak.

209.   The City's enactment and enforcement of the Ordinance restricts these rights by controlling the content of what Plaintiffs and other Owners say, compelling them to speak, and compelling the content of that speech.

210.   Specifically, the Ordinance requires Owners to communicate specific screening criteria to applicants.

211.   The Ordinance also requires Owners to provide dictated language in their leases stating that the Owner cannot terminate a lease without Just Cause as set forth in the Ordinance.  Furthermore, where an Owner seeks to terminate a tenancy, the owner must provide notice, in writing, of the reasons for the termination and the facts in support of those reasons.

212.   Finally, the Ordinance requires Owners to provide the City and affected tenants with notice, in a means dictated by the City, when an Owner elects to sell an Affordable Housing Building.

213.   The content-based speech mandate of the Ordinance is not justified by any compelling state interest.

214.   The content-based speech mandate is not narrowly tailored to serve any purported compelling government interest.

215.   The City's governmental interests are not achieved in any meaningful way by the Ordinance.

216.    The speech mandate of the Ordinance does not serve or advance a substantial government interest.

217.    The speech mandate of the Ordinance restricts Plaintiffs' and other Owners' First Amendment and Minnesota Constitution rights more extensively than necessary to serve the City's governmental interests.

218.    This violation of the First Amendment to the United States Constitution and Article I, Section 3 of the Minnesota Constitution gives rise to both declaratory and injunctive remedies under 28 U.S.C. §§ 2201 and 2202.00.

219.    Plaintiffs are entitled to a declaration from this Court that the Ordinance violates the First Amendment of the United States Constitution and Article I, Section 3 of the Minnesota Constitution.

220.    Plaintiffs have no adequate remedy at law for the harm caused by the Ordinance.  Unless the City is enjoined from enforcing the Ordinance, Plaintiffs and other Owners will be irreparably injured, as they will be deprived of their rights under the United States Constitution and the Minnesota Constitution, will continue to suffer substantial loss of rents, profits, and good will, the nature and extent of which is impossible to ascertain, and will unnecessarily subject their tenants to unsafe situations.

**COUNT FIVE**
**Due Process - Void for Vagueness**
**U.S. Const. Amend. XIV and Minn. Const. Art. I, § 7**
**42 U.S.C. §§ 1983 and 1988, and 28 U.S.C. §§ 2201 and 2202**

221.    Plaintiffs incorporate by reference the preceding paragraphs as if set forth at length herein.

222.    The Fourteenth Amendment of the United States Constitution and Article I, Section 7 of the Minnesota Constitution provide that states shall not deprive any persons of life, liberty, or property without due process of law.  U.S. Const. Amend. XIV; Minn. Const. art. I, § 7.

223.    The Ordinance deprives Plaintiffs and other Owners of their rights to due process under Fourteenth Amendment of the United States Constitution and Article I, Section 7 of the Minnesota Constitution because it is unconstitutionally vague.

224.    A penal statute or ordinance must define the criminal offense with a sufficient definiteness so that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement.

225.    When a vague statute or ordinance implicates First Amendment rights, as the Ordinance does here, the statute or ordinance is unconstitutional if it fails to give a person of ordinary intelligence fair notice that his conduct is forbidden by the statute or ordinance or where it authorizes or encourages arbitrary and discriminatory enforcement.

226.    As set forth in detail above, the Ordinance is unconstitutionally vague in many key respects.

227.    The Ordinance makes non-compliance a crime, but does not clearly define that crime with a level of definiteness to inform Owners what conduct is prohibited.

228.    These violations of the Fourteenth Amendment to the United States Constitution and Article I, Section 7 of the Minnesota Constitution give rise to both declaratory and injunctive remedies under 28 U.S.C. §§ 2201 and 2202.00.

229.    Plaintiffs are entitled to a declaration from this Court that the Ordinance violates the Fourteenth Amendment of the United States Constitution and Article I, Section 7 of the Minnesota Constitution.

230.    Plaintiffs have no adequate remedy at law for the harm caused by the Ordinance.  Unless the City is enjoined from enforcing the Ordinance, Plaintiffs and other Owners will be irreparably injured, as they will be deprived of their rights under the United States Constitution and the Minnesota Constitution, will continue to suffer substantial loss of rents, profits, and good will, the nature and extent of which is impossible to ascertain, and will unnecessarily subject their tenants to unsafe situations.

**COUNT SIX**
**Impairment of Contractual Relationships**
**U.S. Const. Art. I, § 10 and Minn. Const. Art. I, § 11**
**42 U.S.C. §§ 1983 and 1988, and 28 U.S.C. §§ 2201 and 2202**

231.    Plaintiffs incorporate by reference the preceding paragraphs as if set forth at length herein.

232.    Plaintiffs and other Owners enter into contractual relationships, or leases, with their tenants.  The leases set forth the rights and obligations of both Plaintiffs and other Owners and the tenants.

233.    The Ordinance impairs the contractual relationship between Plaintiffs and other Owners and tenants by changing and limiting the grounds on which Plaintiffs and other Owners may rely when non-renewing or terminating a lease.

234.    To warrant termination, Plaintiffs and other Owners must establish, for example, a complete failure of rent, a repeated late payment of rent, and/or material non-

compliance with lease obligations.  Plaintiffs and other Owners must provide the tenant with facts to support the termination, as well as an opportunity to cure the deficiency. These provisions are not included in the existing leases entered into by Plaintiffs and other Owners and their tenants.

235.    The Ordinance further impairs the contractual relationship between Plaintiffs and other Owners and tenants by requiring a Plaintiff or other Owner to provide relocation assistance payments when terminating a tenancy for rehabilitation purposes, on government order or when terminating a tenancy on grounds not dictated by the City.

236.    These impairments are substantial to Plaintiffs and other Owners.

237.    The City has no significant and legitimate purpose to justify the Ordinance's substantial impairment of contractual relationships.

238.    There are no reasonable conditions of a character appropriate to any public purpose that justifies the Ordinance's substantial impairment of contractual relationships.

239.    This violation of the Article I, Section 10 of the United States Constitution and Article I, Section 11 of the Minnesota Constitution gives rise to both declaratory and injunctive remedies under 28 U.S.C. §§ 2201 and 2202.00.

240.    Plaintiffs are entitled to a declaration from this Court that the Ordinance violates the Article I, Section 10 of the United States Constitution and Article I, Section 11 of the Minnesota Constitution.

241.    Plaintiffs have no adequate remedy at law for the harm caused by the Ordinance.  Unless the City is enjoined from enforcing the Ordinance, Plaintiffs and other Owners will be irreparably injured, as they will be deprived of their rights under the

United States Constitution and the Minnesota Constitution, will be deprived of their rights under the lease contracts they have negotiated with their tenants, and will suffer substantial loss of rents, profits, and good will, the nature and extent of which is impossible to ascertain.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully request that the Court grant them relief as follows:

242.    Declaring St. Paul Ordinance 20-14, governing Tenant Protections, to be invalid and unenforceable because:

a.   It is a taking without just compensation in violation of the Fifth Amendment of the United States Constitution and Article I, Section 13 of the Minnesota Constitution;

b.   It deprives Plaintiffs and other Owners of fundamental property rights in violation of the Fourteenth Amendment of the United States Constitution and Article I, Section 7 of the Minnesota Constitution;

c.   It deprives Plaintiffs and other Owners of procedural due process rights in violation of the Fourteenth Amendment of the United States Constitution and Article I, Section 7 of the Minnesota Constitution;

d.   It compels Plaintiffs' and other Owners' speech in violation of the First Amendment of the United States Constitution and Article I, Section 3 of the Minnesota Constitution; and

    e.  It is void for vagueness under the Fourteenth Amendment of the United States Constitution and Article I, Section 7 of the Minnesota Constitution;

    f.  It impairs Plaintiffs and other Owners' contractual relationships in violation of Article I, Section 10 of the United States Constitution and Article I, Section 11 of the Minnesota Constitution.

243.    Enjoining the City of St. Paul from taking any action to implement or enforce St. Paul Ordinance 20-14;

244.    Awarding Plaintiffs just compensation for unlawful takings in an amount to be proven at trial;

245.    Awarding Plaintiffs their reasonable costs and attorneys' fees incurred in bringing this action pursuant to 42 U.S.C. § 1988 and any other applicable sources of law; and

246.    Granting Plaintiffs such other and further relief as this Court deems proper.

COZEN O'CONNOR


*/s/ Mark Jacobson*
Mark Jacobson (#0188943)
E-mail: mjacobson@cozen.com
Steven Katkov (#0202769)
E-mail: skatkov@cozen.com
Cassandra M. Jacobsen (#0400120)
E-mail: cjacobsen@cozen.com
33 South Sixth Street, Suite 3800
Minneapolis, MN 55402
Telephone: 612.260.9000


Calli Padilla (PA #312102)
(*pro hac vice* admission pending)
E-mail: cpadilla@cozen.com
1650 Market Street, Suite 2800
Philadelphia, PA 19103
Telephone: 215-665-2000

*Attorneys for Plaintiffs*

Dated:   February 12, 2021