UNITED STATES DISTRICT COURT

DISTRICT OF MINNESOTA

---

Lamplighter Village Apartments LLLP, 1023 Grand Avenue LLC, 1708 and 1712 Grand Avenue LLC, 1947 Grand Avenue LLC, 231 Dayton Avenue LLC, 707 and 711 Grand Avenue LLC, Alton-SHN, LLC, Alton-NFLP, LLC, and Alton-HRG, LLC, LLC, Highland Ridge, LLLP, Lucas Goring, Madison LLC, Minnehaha Avenue Apartments, LLC, Oaks Union Depot LLC, Oxford Apartments LLC, Plaza, LLLP, Rockwood Place, LP, Wellington-NFLP, LLC, Wellington-PFP, LLC, Wellington-SHN, LLC, Woodstone Limited Partnership, and Yea Thao,

        Plaintiffs,

v.

City of Saint Paul,

        Defendant.

Civil Action No.: 21-cv-413 PAM/HB

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

---

## I.    PRELIMINARY STATEMENT

Plaintiffs, a cross-section of owners of apartment and other private multifamily residential housing in Saint Paul, Minnesota ("Owners") challenge the constitutionality of Saint Paul Ordinance 20-14. The Ordinance requires Owners to narrow their tenant screening criteria and thereby execute leases and tender possession of their property to individuals they would otherwise exclude, depriving Owners of a core property right. The Ordinance is therefore subject to strict scrutiny, and it does not meet the requirement of being narrowly tailored to advance compelling state interests. This seriously flawed and

unconstitutional Ordinance cannot remain in force.  Plaintiffs accordingly move for the entry of a Preliminary Injunction prohibiting the enforcement of the Ordinance until a trial on the merits can be held.

## II.  FACTS

### A.  PLAINTIFFS

Plaintiffs are all owners of multifamily housing in St. Paul and constitute a broad spectrum of residential landlords in St. Paul of properties leased for residential use. (Declaration of Leanna Stefaniak ("Stefaniak Decl.") at ¶¶1-4; Declaration of Lucas Goring ("Goring Decl.") at ¶¶1-2; Declaration of Chue Kue ("Kue Decl.") at ¶¶1-4; Declaration of Lisa Moe ("Moe Decl.") at ¶¶1-11).

Chue Kue manages seven (7) residential dwellings owned by his wife, Yea Thao, including units that house Section 8 tenants.  (Kue Decl., ¶¶2-3).  Lucas Goring owns a single-family dwelling unit and a five (5) dwelling unit building in St. Paul.  (Goring Decl., ¶¶2-3).  A variety of plaintiff companies own eight (8) residential rental properties in St. Paul with over 1000 units managed by StuartCo, including memory care and skilled nursing units, affordable housing units, senior citizen units, and traditional residential units. (Moe Decl., ¶¶1-11).

Despite their varying share of the rental market, leasing to responsible tenants who can and will honor the terms of their lease is crucial to each of these Plaintiffs.  Leasing property is risky as it involves giving up much of Plaintiffs' own interest in their property and granting a tenant the exclusive right to possess their property during the term of the tenancy.  (Stefaniak Decl., ¶5; Kue Decl., ¶5; Moe Decl., ¶13; Goring Decl., ¶5).  A tenant

who is in exclusive possession of Plaintiffs' property may significantly damage the premises, which is time-consuming and expensive to remediate.  (Stefaniak Decl., ¶6; Kue Decl., ¶6; Moe Decl., ¶14; Goring Decl., ¶6).  The costs of remediating this damage often far exceed the amount of any security deposits.  (Stefaniak Decl., ¶7; Kue Decl., ¶7; Moe Decl., ¶14; Goring Decl., ¶6).

Plaintiffs expect to make money on the rental payments from the tenants to whom the propriety is rented – in fact, rents are the sole source of funds for Plaintiffs to meet the debt service on their properties, operate them, and generate a return on investment. (Stefaniak Decl., ¶¶52-53; Kue Decl., ¶¶49-52; Moe Decl. ¶¶56-58; Goring Decl., ¶¶45-50).  A very real risk of leasing is that tenants will consistently make late rental payments or fail to make the payments at all.  (*See, e.g.*, Stefaniak Decl., ¶¶5, 8, 26, 31, 32).

Eviction – be it for non-payment or damage to the property or other violations of the lease terms – is a costly, time-consuming, and drawn-out process.  (Stefaniak Decl., ¶7; Kue Decl., ¶8; Moe Decl., ¶15; Goring Decl., ¶7).  Evictions often require engaging legal counsel, given the nature of a lease, rights afforded residential tenants, and the requirements of Ramsey County courts that corporate entities be represented by a lawyer. (Moe Decl. ¶15.)  An eviction of one tenant can cost several thousand dollars in costs and fees, not including the time and attention necessary to see the process through.  (*Id.*). Tenants often remain in the property while the eviction case is pending, causing unpaid rents to continue to mount, along with the possibility of further damage to the premises during the eviction process.  (Stefaniak Decl., ¶8; Moe Decl., ¶14; Goring Decl., ¶8).  An owner rarely recovers unpaid rents or reimbursement of damage caused to the property and

3

it is extremely difficult to collect a judgment against an evicted tenant.  (Stefaniak Decl., ¶8; Moe Decl., ¶14; Goring Decl., ¶8).

Owners seek to avoid these circumstances and have spent years establishing screening criteria for prospective tenants that are predictive of a tenants' likelihood of defaulting, damaging the premises or engaging in disruptive conduct.  (Stefaniak Decl., ¶¶10-12; Kue Decl., ¶¶11-12; Moe Decl., ¶¶18-20; Goring Decl., ¶¶11-12).  These criteria include an applicant's criminal record, credit score and history, history of past evictions, and prior rental history.  (*Id.*).  Owners (or their management companies), particularly Owners of many units, typically develop weighted matrices of screening criteria that are applied objectively to qualify a tenant applicant.  (*Id.*).  While some criteria may be completely disabling, such as conviction of a violent felony, some criteria are simply factors to be considered along with other screening criteria.  (Stefaniak Decl., ¶¶10-16; Kue Decl., ¶¶10-18; Moe Decl., ¶14; Goring Decl., ¶¶10-18).  Many Plaintiffs consider all of these criteria, but the weighting and consideration of extenuating factors vary among Plaintiffs.  (*See id.*).

B.      **THE SAINT PAUL ORDINANCE**

Ignoring Owners' long-held right to control access to their property, the City enacted the Ordinance in July 2020.[1]  The Ordinance unconstitutionally impacts Owners in three significant ways – by controlling and imposing substantial limitations on the criteria Owners may consider in screening applicants, by greatly limiting their ability to

---

[1] The Ordinance is effective March 1, 2021.

terminate leases at their expiration, and by imposing substantial new conditions on Owners selling their properties.  (*See* Declaration of Mark A. Jacobson, Ex. A).

### 1.    Prospective Tenant Screening Guidelines

The Ordinance first seeks to dictate what criteria Owners may consider when screening prospective tenants. (*See* Jacobson Decl., Ex. A at § 193.04 (the "Screening Ordinance")).  The Screening Ordinance provides that, before accepting applications for rental housing, an Owner "must provide written rental screening criteria to all applicants." (*Id.*).  The Screening Ordinance mandates that Owners "must apply uniform screening criteria" and "cannot disqualify an applicant" for certain reasons, including the applicant's criminal history, credit score, and/or rental history.[2]  (*Id.*).

The Screening Ordinance also prohibits an Owner from rejecting an applicant for various reasons, including:

Section 193.04(b)(1)

* * *

> g.    Any misdemeanor, gross misdemeanor or felony conviction stemming from the following traffic offenses: reckless driving, driving without a license, driving with a suspended or revoked license, and DUI that did not result in additional charges for injury to a person;
>
> h.    Any conviction for misdemeanor or gross misdemeanor offenses for which the dates of sentencing are older than three (3) years;
>
> i.    Except as provided in paragraph (j) below, any criminal conviction for felony offenses for which the dates of sentencing are older than seven (7) years; however, a landlord may deny an applicant who has

---

[2] Unlike a somewhat similar ordinance in Minneapolis, the Screening Ordinance here provides no alternative under which an Owner may avoid using the mandatory screening criteria.

been convicted of the illegal manufacture or distribution of a controlled substance as defined in section 102 of the Controlled Substances Act (21 U.S.C. 802), or for those same offenses that mandate denial of tenancy in federally assisted housing subject to federal regulations, including but not limited to when any member of the household is subject to a lifetime sex offender registration requirement under a state sex offender registration program;

j.     Any criminal conviction for the following felony offenses for which the dates of sentencing are older than ten (10) years: first-degree assault (Minnesota Statutes section 609.221), first-degree arson (Minnesota Statutes section 609.561), aggravated robbery (Minnesota Statutes section 609.245), first-degree murder (Minnesota Statutes section 609.185), second-degree murder (Minnesota Statutes section 609.19), third-degree murder (Minnesota Statutes section 609.195), first-degree manslaughter (Minnesota Statutes section 609.20), kidnaping (Minnesota Statutes section 609.25), or first-degree criminal sexual conduct (Minnesota Statutes section 609.342).

(*Id.*).

An Owner is also prohibited from rejecting an applicant based on a credit score alone or insufficient credit history. With respect to rental history, Section 193.04(b)(3) of the Screening Ordinance prohibits an Owner from rejecting an applicant on the following bases:

a.     An eviction action pursuant to Minnesota Statutes Chapter 504 or other equivalents in other states, if the action occurred three (3) or more years before the applicant submits the application or if the action occurred during the three years immediately preceding submission of the application but did not result in a judgment entered against the applicant;

b.     Insufficient rental history, unless the applicant in bad faith withholds rental history information that might otherwise form a basis for denial.

c.     If a landlord uses a minimum income test requiring an income equal to two and a half (2.5) times the rent or higher, the landlord must allow an exception to that test where the applicant can demonstrate a history

of successful rent payment with the same or lower ratio of income to rent;

Owners are also prohibited from obtaining from a tenant more than a single month's rent as a security deposit after applying the Applicant Screening Guidelines required by the Ordinance. (*Id.* at § 193.03 ("Security Deposit Ordinance")).

### 2.     Just Cause Notice of Termination

In addition to limiting the screening criteria by which Owners rent their units, the City further dictates and severely limits the grounds by which an Owner may terminate a tenancy or not renew a lease through Section 193.05 (the "Just Cause Ordinance"). (*See* Jacobson Decl., Ex. A at § 193.05). According to the Just Cause Ordinance, absent specific circumstances deemed by the ordinance to be Just Cause, a tenant may choose to extend the lease in perpetuity.

Currently, Owners often opt to non-renew a tenant rather than evict a tenant. For example, a tenant may cease paying rent or routinely fail to pay rent on time. When the lease is close to expiration, an Owner might simply elect not to renew that tenant's lease. (Stefaniak Decl., ¶¶35-37; Kue Decl., ¶¶29-31; Moe Decl., ¶¶39-41; Goring Decl., ¶31-34). However, the Just Cause Ordinance severely hinders Owners' ability to do so. (Stefaniak Decl., ¶38; Kue Decl ¶32; Moe Decl., ¶42; Goring Decl., ¶35 ). The Just Cause Ordinance requires Owners either to first give the non-paying tenant notice of non-payment and a chance to cure their deficiency or to institute eviction proceedings against the tenant. (*See* Jacobson Decl., Ex. A at § 193.05).

Specifically, the Just Cause Ordinance limits an Owner's ability to terminate a tenancy, including by non-renewal of the lease, to only situations where the Owner can establish (1) non-payment of rent, after notice and failure to cure; (2) repeated late payment of rent at least five out of twelve consecutive months, with written notice after each late payment; (3) material non-compliance with lease provisions, after notice and failure to cure; (4) the tenant's refusal to renew or extend, after written request from the Owner; (5) good-faith recovery of possession for residency by the Owner or a family member; (6) building demolishment and dwelling unit conversion; (7) rehab and renovation, after written notice and monetary relocation assistance; (8) government order to vacate, after written notice and monetary relocation assistance; (9) termination of employment where occupancy is conditioned upon employment; or (10) exceeding occupancy standards. (*Id.*). When an Owner does terminate a tenancy based on one of these situations, the Owner is required to provide written notice including the reasons for the termination and the facts in support of those reasons. (*Id.*).

Notably, the Just Cause Ordinance requires that all residential tenant leases must include dictated Just Cause language: "The landlord under this lease shall not unilaterally terminate or attempt to terminate the tenancy of any tenant *unless the landlord can prove in court that Just Cause exists*." (*Id.* (emphasis added)). Failure to comply with this high burden, even for non-renewal of a lease, comes with severe consequences including liability for damages to the tenant equal to relocation assistance, costs of suit or arbitration, and attorneys' fees, as well as criminal prosecution and administrative fines. (*Id.* at §193.09(a)&(b)).

8

### 3.    Advanced Notice of Sale of Affordable Housing

The Ordinance also dictates the way in which an Owner may sell any affordable housing properties it owns (*Id.* at §193.06 ("Advanced Notice of Sale Ordinance")).  Under the Advanced Notice of Sale Ordinance, an Owner who intends to make "Available for Sale" any "Affordable Housing Building" must provide notice to the Director of the Department of Planning and Economic Development in a form proscribed by the City no later than ninety (90) days prior to that property being made Available for Sale.  (*Id.*).  The Owner is also required to provide notice to all affected tenants no later than ninety (90) days prior to the property being made Available for Sale, along with City-dictated notice language.  (*Id.*).

## C.    ENACTMENT, IMPLEMENTATION, AND ENFORCEMENT OF THE ORDINANCE

Of particular concern is the City's failure to provide Owners with a meaningful opportunity to be heard prior to the enactment of the Ordinance.  (Moe Decl., ¶¶61-63).  Prior to enactment, the City claimed to work closely with Owners and other members of the residential rental community to create an Ordinance that was both effective and workable for all involved parties. (*Id.*).  However, when it came time to take a vote to pass the Ordinance, City Council unilaterally put a limit on the number of attendees, instituting a so-called "lottery" process.  (*Id.*).  This arbitrary limitation resulted in only members of the public being able to attend and speak on behalf of all residents of Saint Paul – excluding countless other Owners, including some Plaintiffs, from this public City Council meeting. (*Id.*).

The Ordinance was enacted in July 2020 and becomes effective March 1, 2021.  (*See* Jacobson Decl., Ex. A). The Ordinance promises that an Implementation Task Force comprised of tenants, landlords, and their advocates would adopt rules and an implementation plan for the Ordinance, including a plan for educating landlords and tenants about the provisions in the Ordinance.  (*See* Jacobson Decl., Ex. A at § 193.13). While the Implementation Task Force has been formed, it has failed to create or execute any rules or implementation plan or create an outreach and engagement plan for landlords or tenants at any time prior to the filing of this Complaint.  As a result, Owners are left without guidance on this Ordinance while facing strict enforcement guidelines and the risk of criminal prosecution, administrative fines, and private rights of action by tenants.  (*Id.* at § 193.09).

## III.   LEGAL ARGUMENT

### A.   STANDARD OF REVIEW

The Court has broad power to grant preliminary injunctive relief to prevent irreparable injury by maintaining the status quo until a decision may be rendered on the merits.  *Granny Goose Foods, Inc. v. Bhd. Of Teamsters & Auto Truck Drivers Local No. 70*, 415 U.S. 423, 439 (1974); Fed. R. Civ. P. 65(a)(1).  Four factors are considered in determining the appropriateness of injunctive relief: "(1) the threat of irreparable harm to the movant; (2) the state of the balance between this harm and the injury that granting the injunction will inflict on other parties litigant; (3) the probability that movant will succeed on the merits; and (4) the public interest."  *Dataphase Sys., Inc. v. C L Sys., Inc.*, 640 F.2d 109, 113 (8th Cir. 1981)(en banc). No single factor is dispositive, and ordinarily the court

must balance the factors to determine whether justice requires intervention.  *Baker Elec. Coop., Inc. v. Chaske*, 28 F.3d 1466, 1472 (8th Cir. 1994); *Hill v. Xyquad*, 939 F.2d 627, 630 (8th Cir. 1991).

However, where plaintiff raises constitutional challenges, the fundamental consideration is whether the challenges are likely to succeed on the merits.  *Id.*  If that is established, the other elements typically balanced in ruling on a motion for a preliminary injunction are of necessity established as well.  *See Bank One, Utah v. Guttau*, 190 F.3d 844, 847-48 (8th Cir. 1999).  Enforcement of an unconstitutional ordinance inherently causes irreparable harm, is inconsistent with the public interest, and can never otherwise be counterbalanced by harm to the government.  *Id.*; *Phelps-Roper v. Nixon*, 545 F.3d 685, 690 (8th Cir. 2008), *overruled on other grounds by Phelps-Roper v. City of Manchester*, 697 F.3d 678, 692 (8th Cir. 2012) (en banc).  As Plaintiff will demonstrate, each *Dataphase* factor weighs in favor of Plaintiffs' request for an injunction relating to the enforcement of the Ordinance until this litigation is resolved.

## B.   PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS OF THEIR CONSTITUTIONAL CLAIMS

### 1.   The Ordinance Effectuates an Unconstitutional Taking of Owners' Property.

#### a.   Forcing the Entry of Unwanted Tenants Upon Owners' Property For A Public Use Constitutes a Classic Taking.

The sanctity of property rights is a foundational principle of this country that is embodied in several of the guarantees afforded by the Bill of Rights.  U.S. Const. amend. V (government may not deprive citizens of "life, liberty or property without due process

11

of law."); *id*. at amend. IV ("The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated[.]").

A core component of these constitutional guarantees is the Fifth Amendment's Takings Clause.  It provides that "private property [shall not] be *taken for public use*, without just compensation."   *Id*. at amend. V (emphasis added).   The Fourteenth Amendment extends this prohibition to the states.  *Lingle v. Chevron U.S.A., Inc.*, 544 U.S. 528, 536 (2005).  The Minnesota Constitution offers the same protections.  *See* Minn. Const. art. I, §13 (directing that "[p]rivate property shall not be taken, destroyed or damaged for public use without just compensation.").

An unconstitutional taking occurs when government action directly interferes with a property owner's exercise of any of the bundle of rights intrinsic to property ownership. A direct physical invasion occurs when physical occupation is appropriated by "the State, or [] a party authorized by the State."  *Loretto v. Teleprompter Manhattan CATV Corp.,* 458 U.S. 419, 433 n.9 (1982).  The right to exclude others from one's property is "one of the most treasured strands in an owner's bundle of property rights."  *Id*. at 435; *PruneYard Shopping Ctr. v. Robbins*, 447 U.S. 74, 82 (1980) ("It is true that one of the essential sticks in the bundle of property rights is the right to exclude others."); *see also Kaiser Aetna v. United States,* 444 U.S. 164, 176 (1979) (right to exclude is "one of the most essential sticks in the bundle of rights that are commonly characterized as property."); *Int'l News Serv. v. Associated Press*, 248 U.S. 215, 250 (1918) (Brandeis, J., dissenting) ("An essential element of individual property is the legal right to exclude others from enjoying it."); Richard A. Epstein, *Takings: Private Property and the Power of Eminent Domain* 63

12

(1985) (describing "[t]he notion of exclusive possession" as "implicit in the basic conception of private property").

Owners' rights to decide whether to lease property, who will be invited onto their land, and ultimately, if and to whom it will be conveyed are embodied in these constitutional principles. Any deprivation of these rights constitutes a taking. *See Hodel v. Irving*, 481 U.S. 704, 712-18 (1987).

As the Supreme Court explained in *Lingle*:

> [P]hysical takings require compensation because of the unique burden they impose: ***A permanent physical invasion***, however minimal the economic cost it entails, ***eviscerates the owner's right to exclude others from entering and using her property*** – perhaps the most fundamental of property interests.

544 U.S. at 539 (emphasis added). "[A]n owner suffers a special type of injury when a *stranger* invades and occupies the owner's property." *Loretto,* 458 U.S. at 436 (internal citations omitted) (emphasis in original). "[S]uch an occupation is qualitatively more severe than a regulation of the *use* of property[.]" *Id.* (emphasis in original). By this standard, the Ordinance plainly effectuates a taking. By prohibiting Owners from using screening criteria they now use, the Ordinance inevitably requires Owners to lease to individuals they otherwise would disqualify.

Under the Ordinance, misdemeanor and felony convictions may not be considered more than three years and more than 7-10 years after the date of sentencing, respectively. Additionally, neither credit scores by themselves nor lack of credit history may be considered and the right to consider adverse rental history is constrained. If an Owner imposes an income requirement of two and half times the rent, it must allow an exception

if prospective tenants can demonstrate a history of successful rent payment with the same or lower ratio of income to rent. The Ordinance thereby substitutes government mandated screening criteria for those criteria Owners believe are most predictive of a prospective tenants' likelihood to default, damage the premises or pose a threat to others.

While Plaintiffs' screening criteria are not uniform, every Plaintiff applies at least some criteria more prohibitive than the Ordinance authorizes. For example, credit scores below a set minimum are automatically disqualifying for most Plaintiffs. (*See, e.g.*, Stefaniak Decl., ¶25; Kue Decl., ¶27; Moe Decl., ¶14; Goring Decl., ¶25). Plaintiffs often will not lease to individuals convicted of violent crimes and exclude individuals with prostitution convictions to avoid the risk of a tenant attracting solicitors to the premises. (Stefaniak Decl., ¶16; Kue Decl., ¶16; Moe Decl., ¶14; Goring Decl., ¶16). Under the Ordinance, Owners would be forced to abandon their policies of refusing to rent to anyone convicted of a violent felony, with low credit scores, and prior evictions. (Stefaniak Decl., ¶¶19-23, 29, 30; Kue Decl., ¶¶19-23; Moe Decl., ¶¶27-31, 34; Goring Decl., ¶¶19-23).

Moreover, the Ordinance will force Owners to rent to tenants just released from prison. (*See id.*). Assuming the date of sentencing is when a judge imposes the sentence, a prospective tenant may be incarcerated for a long enough period that his application can *never* be rejected as a result of that crime. For instance, if an applicant were convicted of first degree murder, sentenced in 2010, and released from prison in 2021, the Ordinance would prohibit every Owner from rejecting that applicant for his crime, even the day after his release from prison. Even the Ordinance recognizes that the risk of a person convicted of a crime only diminishes "over time". (*See* Jacobsen Decl., Ex. A). So, Owners typically

will not lease to recently released inmates. (*See, e.g.,* Kue Decl., ¶20; Moe Decl., ¶27; Goring Decl., ¶20).

Perhaps most disturbingly, the Ordinance's absolute prohibition of considering a conviction after the specified number of years means they cannot be considered for any purpose – even to screen out applicants with multiple convictions. Owners may be required to rent to applicants with a long list of convictions simply because the last time the prospective tenant **was sentenced** (again, not released from prison) exceeds the allowable period for that crime.

The intrusion the Ordinance authorizes is substantial. Leases convey the right to exclusive possession – a fundamental attendant right of property ownership – of the demised premises. *Goodwin v. Clover*, 98 N.W. 322, 323 (Minn. 1904) (describing a tenant's rights as the "right to occupy" and the "*superior right* to the possession of the land") (emphasis added); *State v. Bowman*, 279 N.W. 214, 215 (Minn. 1938) (stating that a "tenant is one who holds or possesses lands or tenements by any kind of right or title[.]").

The Supreme Court characterized a "forced leasehold" as a classic taking in *Tahoe Sierra Pres. Council, Inc. v. Tahoe Reg'l Planning Agency*, 535 U.S. 302, 323 (2002), holding that a forced leasehold interferes with the "the right to admit and exclude others, and the right to use [property] for a public purpose." *Id.* at 324 n.19. In *Loretto*, the Supreme Court held that government may not "require the landlord to suffer the physical occupation of a portion of his building by a third party[.]" 458 U.S. at 440. The fact that a leasehold gives tenants authority to determine who else may enter upon the property makes the deprivation of the Owners' property rights more severe. *Loretto*, 458 U.S. at

436 ("To require, as well, that an owner permit another to exercise complete dominion literally adds insult to injury.").

The taking implemented by the Ordinance is for a "public use" because its goal is to address a perceived, although vaguely identified, societal problem.  Section 1 of the Ordinance refers to "stagnant wages, increasing rents, a lack of affordable housing, and a consistently low housing vacancy rate" "making it harder for Saint Paul residents to find housing and to afford it over time." (Jacobson Decl. at Ex. A, §1).  As addressing housing inadequacies is a government social welfare responsibility, achieving these ends is a public burden.  The City's solution to these perceived social welfare issues is to impermissibly require Owners alone to bear the burden of accepting applicants of more limited means, with more extensive criminal backgrounds and more significant issues in prior rentals and in meeting financial obligations.  *See Arkansas Game & Fish Com'n v. U.S.*, 568 U.S. 23, 31 (2012) ("Takings Clause is "designed to bar Government from forcing some people alone to bear public burdens") (internal quotations and citations omitted).

Taking property to remedy perceived social ills is no different than taking it to construct a highway or a public building.  Each action is for a public use, theoretically to benefit society as a whole. *Cienega Gardens v. United States,* 331 F.3d 1319, 1338-39 (Fed. Cir. 2003) ("Congress' objective in passing [the laws] – preserving low-income housing – and method – forcing some owners to keep accepting below-market rents – is the kind of expense-shifting to a few persons that amounts to a taking.").

The burdens the Ordinance imposes upon Plaintiffs extend beyond the irreparable harm inherent in taking their property rights.  The costs of a tenant defaulting on a lease,

damaging the property, or engaging in criminal or other disruptive conduct falls on the Owner. Evictions take time during which the property generates no income while carrying costs continue. Evictions are also an expensive process. Owners furthermore bear the ultimate burden of repairing property damage, which often is not entirely covered by security deposits.

Additionally, property owners have a duty to address and prevent disruptive conduct in their properties. (*See, e.g.,* Stefaniak Decl., ¶9; Kue Decl., ¶9; Moe Decl., ¶17; Goring Decl., ¶9). City ordinances and Minnesota Statutes impose the duty upon Owners, with the assistance of City personnel, to prevent the commission of certain crimes and conduct on their premises, such as prostitution, drug activity, illegal possession of weapons, and disorderly conduct. Ordinance 231.01; Minn. Stat. 504B.171. An increase in criminal activity on the premises will lead to heightened licensing oversight, City intervention, or even revocation of Owners' rental licenses. (*Id.*) Owners also face civil claims by persons their tenants injure.

To make matters worse, the Security Deposit Ordinance precludes Owners from attempting to obtain security for the additional risks imposed upon them by prohibiting them from requiring a security deposit of more than one month's rent. Prior to the enactment of the Ordinance and the Security Deposit Ordinance, if an applicant had, for example, one to three late payments within the past 12 months, a low credit score, or negative references, each of which would be disabling, Owners could obtain an additional security deposit to ameliorate any potential financial risk in renting to that applicant. By now barring this practice, the City has imposed additional risk on Owners while prohibiting

them from taking reasonable measures to insure against it.

The City has effectively seized control of the tenant screening process to address societal issues and will inevitably require landlords to lease to individuals they would otherwise exclude.  The Ordinance effects a classic taking of property for a public use without just compensation.

### b.    The Ordinance Also Effectuates A Regulatory *Per Se* Taking.

It is important to note that forced leaseholds effectuate traditional, not regulatory, takings.  *Tahoe Sierra Pres. Council, Inc.*, 535 U.S. at 323.  However, even if the taking were regulatory in nature, the Ordinance still effectuates a *per se* taking because it authorizes a permanent physical invasion of property.  As set forth previously, requiring landlords to rent to individuals they would otherwise disqualify results in a physical invasion.  That invasion is also permanent.

Permanence, in this context, distinguishes "an occupancy that is transient and relatively inconsequential."  *Hendler v. United States,* 952 F.2d 1364, 1377 (Fed. Cir. 1991).  It "does not mean forever, or anything like it."  *Id.*  Once again, each lease grants to a tenant exclusive possession of the demised premises.  Under the Ordinance, leases are perpetual, at the tenant's option, unless the Owner can establish Just Cause for termination or non-renewal of the lease.  These rights are not "transient" or "inconsequential."  *Id.* at 1377.  Even if a tenant does elect to move out, the landlord remains subject to the Ordinance, so a new, unwelcomed outsider may occupy the property.

Moreover, it is the authorized invasion that must be permanent, not each specific invasion.  *Nollan v. California Coastal Commission,* 483 U.S. 825, 832 (1987) (regulation

18

provided a "permanent and continuous right" to access the property, such that the property "may" be continuously occupied); *Iowa Assur. Corp. v. City of Indianola, Iowa*, 650 F.3d 1094, 1098 (8th Cir. 2011) (the cornerstone of a *Loretto* claim is whether a regulation "erode[s]" the property owner's "right to exclude others from the property[.]").

In *Kaiser Aetna v. United States*, a landowner built a channel between a private pond and an adjacent ocean. 444 U.S. at 164. The federal government determined that creating this channel converted the pond into navigable waters from which the public could not be excluded. *Id.* at 170. The Court held that this decision constituted a *per se* regulatory taking because the determination authorized permanent access to the pond. *Id.* at 180. Obviously, no one person would use the pond permanently or exclusively. As in *Kaiser*, the Ordinance establishes permanent criteria forcing landlords to give an interest in and possession of their property to individuals who would otherwise be disqualified. It is immaterial whether any particular tenancy will be permanent.

In *Dolan v. City of Tigard*, the government sought an easement that would provide public access to private property at all times. 512 U.S. 374, 394 (1994). While the property hosted a store, and the owner was attempting to "attract members of the public to her property," the owner still wanted "to be able to control the time and manner in which" the public could "enter." *Id.* The Court found that notwithstanding the commercial nature of the property, the owner "would lose all rights to regulate the time in which the public entered," such that "[h]er right to exclude would not be regulated, it would be eviscerated." *Id.*

19

In *Golden Gate Hotel Association v. City and County of San Francisco*, the court addressed an ordinance prohibiting residential hotels from ousting tenants unless they performed one of several time-intensive and/or expensive actions.  864 F. Supp. 917, 920 (N.D. Cal. 1993), *vacated on other grounds,* 18 F.3d 1482 (9th Cir. 1994).  Although the hotel owners "voluntarily rented their land to the tenants in the first instance," and the ordinance contained an exception to the general rule against ouster, the court found the ordinance's real-world effect was that landowners were forced to accept the occupation of their property.  *Id.* at 923.  It concluded that the city "forced control over the hotel owners' possession interests in their properties, including the denial of the hotel owners' right to exclude others," and "the resulting deprivation of property rights is sufficient to constitute a physical taking for which compensation is required[.]"  *Id.*

The *Golden Gate* holding rings true here.  The Ordinance is "a per se physical taking because it interferes so drastically with the [ ] property owner's fundamental rights to possess and exclude as to amount to compelled physical occupation."  *Id.*  In the words of the *Nollan* Court, to say that this Ordinance is "a mere restriction" on a property's use "is to use words in a manner that deprives them of all ordinary meaning."  *Nollan,* 483 U.S. at 831.  There is no contortion of law or fact that would render this Ordinance anything other than a permanent physical invasion.

      c.      **The "Extraordinary" Nature of the City's Action Also Renders The Ordinance a Taking Under *Penn Central.***

Government action may constitute an unconstitutional taking even if it does not authorize a permanent physical taking or deprive an owner of all beneficial use if it

nevertheless significantly interferes with property rights.  *Penn Central Transp. Co. v. City of New York,* 438 U.S. 104, 124 (1978).  In *Penn Central*, the Court adopted a multi-factor analysis to assess whether a regulation has this effect.  Those factors include "(1) the economic impact of the regulation on the claimant; (2) the extent to which the regulation has interfered with distinct investment-backed expectations; and (3) the character of the governmental action."  *Murr v. Wisconsin*, 137 S. Ct. 1933, 1943 (2017).

As expressly stated in *Penn Central*, a taking is "more readily found when the interference with property can be categorized as a physical invasion by government[.]" 438 U.S. at 124.  In this context, the economic impact of a regulation has less bearing on the analysis.  *See Lingle*, 544 U.S. at 539.

In *Hodel*, the Court considered a regulation that, evaluated by investment-backed expectations and economic impact, "might well" be constitutional.  *See* 481 U.S. at 715-16.  The Court nevertheless held that it constitutes a taking because "the character of the Government regulation . . . is extraordinary," in that it "amount[ed] to virtually the abrogation of" an essential stick in the bundle of rights.  *Id.* at 716-18 (citing *Kaiser Aetna,* 444 U.S. at 176).  Because the regulation had the real-world effect of destroying a fundamental property right, it went "too far" and demanded just compensation.  *See id.* Similarly, in *Golden Gate Hotel Association,* the district court held that a hotel ordinance constituted a taking under *Penn Central* without considering evidence as to economic impact. *See* 864 F. Supp. at 926 n.11.

Additionally, regulation amounts to an unconstitutional taking where it singles out specific property owners to bear the burden of solving a broad societal problem.  *See*

*Palazzolo v. Rhode Island*, 533 U.S. 606, 634 (2001) (O'Connor, J., concurring) ("A use restriction on real property may constitute a 'taking' if not reasonably necessary to the effectuation of a substantial public purpose, or perhaps if it has an unduly harsh impact upon the owner's use of the property.") (internal quotations omitted); *Yee v. City of Escondido, Cal.*, 503 U.S. 519, 522 (1992) (restriction on use of property may require compensation if "regulation has unfairly singled out the property owner to bear a burden that should be borne by the public as a whole.")

Even if the Ordinance did not authorize a "permanent physical invasion" so as to constitute a *per se* taking, it certainly authorizes a physical invasion that "amounts to virtually the abrogation" of the power to exclude. *See Hodel*, 481 U.S. at 716. Moreover, it does disproportionately impose the burden of a proposed response to the housing burden upon one segment of society – private residential landlords. These factors compel the conclusion that the Ordinance constitutes a taking under *Penn Central* regardless of its economic impact or interference with landowners' investment-backed expectations.

Moreover, the Ordinance does impose upon landlords' investment-backed expectations and exposes them to significant economic risk. (Stefaniak Decl., ¶¶49, 52; Kue Decl., ¶¶46, 49; Moe Decl., ¶¶53, 56; Goring Decl., ¶¶45, 48). Given the importance of screening tenants to the economic viability of rental properties, landlords reasonably expect to control this process. (*See, e.g.*, Stefaniak Decl.; Kue Decl.; Moe Decl.; Goring Decl.). They have, in fact, historically done so. (*Id.*). Plaintiffs certainly did not anticipate the government seizing control of the tenant screening process when they entered the property leasing business in St. Paul or acquired their properties.

22

2.      **The Ordinance Deprives Plaintiffs of Substantive Due Process.**

      a.      **The Ordinance Is Subject to Strict Scrutiny Review Because it Invades A Fundamental Property Right.**

The Fourteenth Amendment prohibits any deprivation of life, liberty, or property "without due process of law."  U.S. Const. amend. XIV, § 1.  The Minnesota Constitution affords the same protection.  Minn. Const., Article I, Section 7; *Gallagher v. City of Clayton*, 699 F.3d 1013, 1017 (8th Cir. 2012).   Due process requires that legislative enactments depriving citizens of life, liberty, or property rights must advance a legitimate state interest of sufficient magnitude to warrant the deprivation.  *Weiler v. Purkett*, 137 F.3d 1047, 1051 (8th Cir. 1998) (citing *United States v. Salerno*, 481 U.S. 739, 746 (1987)).

In *McGuire v. Indep. Sch. Dist. No.* 833, the Eighth Circuit recognized that:

> To have a constitutionally cognizable property interest in a right or a benefit, a person must have a legitimate claim of entitlement to it. Property interests are not created by the Constitution, they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law. But federal constitutional law determines whether that interest rises to the level of a legitimate claim of entitlement protected by the Due Process Clause.

863 F.3d 1030, 1034 (8th Cir. 2017).   Any deprivation of a constitutionally protected property right triggers due process protection, but how compelling the state's interest must be and the degree of judicial scrutiny of the state's action depends upon the nature of the impacted rights.

Legislation infringing a fundamental right is subject to strict scrutiny.  *Gallagher*, 699 F.3d at 1017 (citing *Washington v. Glucksberg*, 521 U.S. 702, 721 (1997)); *see also Brekke v. City of Blackduck*, 984 F. Supp. 1209, 1235 (D. Minn. 1997) ("[T]he Government

is forbidden from infringing upon certain 'fundamental' liberty property interests to any degree - - no matter what process is provided - - unless the infringement is narrowly tailored to serve a compelling governmental interest."); *SooHoo v. Johnson*, 731 N.W.2d 815, 821 (Minn. 2007) (Minnesota Constitution). Those rights and liberties "which are objectively, deeply rooted in the Nation's history and tradition" are fundamental. *Gallagher*, 699 F.3d at 1017.

The rights attendant to the ownership of real estate are deep rooted in Anglo-Saxon law. *Chicago, B. & Q.R. Co. v. City of Chicago*, 166 U.S. 226, 235-36 (1897) ("Due protection of the rights of property has been regarded as a vital principle of republican institutions."). Real estate ownership is the most fundamental property right. *Kaiser*, 444 U.S. at 176. Citizens' right to be secure in their land holdings has been recognized as far back as the Magna Carta. EDWARD COKE, THE SECOND PART OF THE INSTITUTES OF THE LAWS OF ENGLAND 45 (1797)("[n]o freeman shall be taken, or imprisoned, or be **disseised of his freehold**, . . . but by lawful judgment of his peers, or by the law of the land.") (emphasis added). The Fifth Amendment's Due Process Clause was specifically intended to extend these same protections in this country. *Kerry v. Din*, 576 U.S. 86, 90-92 (2015). As it simply adopts the Fifth Amendment's Due Process Clause, the Fourteenth Amendment was clearly intended to extend its limitations to the states.

As set forth previously, the Supreme Court has found that "one of the most essential sticks in the bundle of rights that are commonly characterized as property" is the ability to grant or deny access as they see fit. *Kaiser*, 444 U.S. at 176 (1979). *See also,* James Madison*, Property,* National Gazette, Mar. 27, 1792 ("This term [property] in its particular

application means 'that dominion which one man claims and exercises over the external things of the world, in exclusion of every other individual.'").

The right to control access to real property is accordingly fundamental. *See e.g.*, *Lingle*, 544 U.S. at 540-41 (2005). *Contrast, Gallagher,* 699 F. 3d at 1017 (refusing to characterize the right to smoke outdoors on public property as fundamental); *Patel v. City of Sauk. Ctr.*, 631 F. Supp. 2d 1139, 1148 (D. Minn. 2007) (refusing to recognize a fundamental right in the transfer of a liquor license).

**b.    The Ordinance Cannot Survive Strict Scrutiny Review**

Where legislation impacts fundamental rights, it must be "narrowly tailored to serve a compelling state interest." *Gallagher,* 699 F. 3d at 1017; *see also Karsjens v. Piper*, 845 F.3d 394, 407 (8th Cir. 2017) ("[T]he strict scrutiny standard . . . is reserved for claims of infringements on fundamental liberty interests upon which the government may not infringe unless the infringement is narrowly tailored to serve a compelling state interest.") (internal quotations and citations omitted); *Brekke*, 984 F. Supp. at 1235 ("[T]he Government is forbidden from infringing upon certain 'fundamental' liberty interests to any degree - - no matter what process is provided - - unless the infringement is narrowly tailored to serve a compelling governmental interest.").

"A narrowly tailored regulation is one that actually advances the state's interests (is necessary), does not sweep too broadly (is not overinclusive), does not leave significant influences bearing on the interest unregulated (is not underinclusive), and could be replaced by no other regulation that could advance the infringement[.]" *Republican Party v. White*, 416 F.3d 738, 749 (8th Cir. 2005).   The Eighth Circuit has found the definition of a

compelling state interest "deceptively self-evident," defining it as an interest "extremely important" or of the "first order." *Id.* (internal citations and quotations omitted). The Ordinance lacks each of these characteristics.

### (1)    The Ordinance is Not Narrowly Tailored to Serve a Compelling State Interest

The Ordinance does not alleviate lack of affordable housing, but instead simply shifts the inadequate available housing to those with convictions, poor credit, and prior evictions, to the detriment of citizens who have avoided those problems. The Ordinance accomplishes this shift with broad restrictions on an Owner's right to exclude unacceptable tenants, terminate leases in accordance with their terms, and sell their property. As such, the Ordinance is not narrowly tailored to serve a compelling state interest and fails strict scrutiny.

In Section 1, the City sets forth the alleged reasons for enacting the Ordinance. The City states that there is a housing crisis in the City of St. Paul and that there is an urgent need to address that crisis as the population grows. (*See* Declaration of Mark A. Jacobson, Ex. A). The City identifies stagnant wages, increasing rents, a lack of affordable housing, and a consistently low housing vacancy rate as circumstances that make it harder for Saint Paul residents to find housing and to afford it over time. (*Id.*). It cites to studies that identify insufficient supply, low income and lack of public funding, racial discrimination, and rental housing policies as the drivers of housing unaffordability and instability. (*Id.*). Another study cited by the City states the most common reasons that adults reported leaving their

26

last housing were: eviction or not having their lease renewed (39%) and being unable to afford rent or house payments (38%).  (*Id.*).

The Ordinance appears to be directed to ameliorating housing cost burdens resulting from low vacancy rates and insufficient supply, rent increases, racial discrimination, low income, lack of public housing, and stagnant wages.  However, criminal records, poor credit ratings, and prior evictions are different issues.  There is no finding that a criminal record, prior eviction, or adverse credit history contributes to housing cost burdens or even prevents individuals from obtaining housing they could otherwise afford.  (*See id.*).  The apparent unrelated references to race and socioeconomic status just further confuse the issue.  *See City of Richmond v. J.A. Croson Co.*, 488 U.S. 469, 498 (1989) (speculation over racial discrimination could not justify racial quotas because legislation must be based on an adequate factual predicate to survive strict scrutiny).

It is claimed that criminal justice research "supports that the effect of a criminal offense on a resident's housing outcome declines over time and becomes insignificant" and it "supports housing as a contributing factor to reducing recidivism."  (Declaration of Mark A. Jacobson, Ex. A).  That, of course, is not an affirmative finding that prior criminal convictions have no bearing on the potential for housing success.  The Ordinance indeed recognizes that a criminal past bears in some circumstances on the potential for housing success or it would not permit the exclusion of applicants on that basis.  (*Id.; see also* Jacobson Decl, Ex C., U.S. Department of Justice, Office of Justice, Bureau of Justice Statistics, JA97 (67.8% of released prisoners were arrested for a new crime within three (3) years and 76.6% were arrested within five (5) years) and Ex. D, U.S. Department of

Justice, Office of Justice, Bureau of Justice Statistics, Recidivism of Sex Offenders Released from State Prison: A 9-Year Follow-Up.   And, the sociological research referenced in the Ordinance was conducted at group facilities with extensive support services that are not available in the private housing governed by this Ordinance.  Further, the author of the study himself publicly announced: "While this study offers some rare insights into the relationship between criminal background and success in housing, there is still a great deal that we don't know. For example: 1. We don't know if the results above can be applied to the rental population as a whole. . . . 2. We couldn't control for everything that contributes to housing outcomes, and we don't know how much that affects our results. . . . 3. We're not sure whether or how the impact of a given type of criminal background differs when a household committed more than one offense of that type. . . . 4. We don't know the impact of every kind of criminal background."  (Jacobson Decl, Ex B, Cael Warren, *Criminal Background's Impact on Housing Success: What we Know (And What We Don't)* (2019)).

In short, the Ordinance does not address the direct causes of the identified housing cost burdens and does nothing to assist other housing cost burdened individuals.  The substantial additional burdens imposed on Owners by the Ordinance are likely to decrease available housing as Owners seek to do business instead in other municipalities that do not impose those burdens and potential new Owners avoid St. Paul and the extraordinary burdens imposed by the Ordinance. Legislation that compounds the problem is not narrowly tailored to a compelling state interest.  In fact, it is completely irrational.

### c.       The Ordinance Fails Even Rational Basis Review

Even if fundamental rights were not at stake, the Ordinance does not survive scrutiny.  An ordinance only passes constitutional muster if it is "a reasonable means to a permissive object." *State v. Behl*, 564 N.W.2d 560, 567 (Minn. 1997)).  The Ordinance is simply not rationally related to any legitimate government interest.  *Gallagher*, 699 F.3d at 1019 (citing *Romer v. Evans*, 517 U.S. 620, 631 (1993)).  Despite the abundance of purported "goals" set forth in the Section 1 Ordinance itself, the Ordinance has none of these desired effects.  As discussed in detail above, it is clear the City failed to think through how the Ordinance would work in practice and whether it would actually advance those interests.  Rather than rectify low vacancy rates, increases in rent, and stagnant wages, which have purportedly made it difficult to access affordable housing, the only practical impact of this Ordinance on housing will be an *increased* cost of doing business leading to a *reduction* in affordable housing.  Accordingly, Plaintiffs are likely to succeed on their substantive due process claim.

Because Plaintiffs have shown they are likely to succeed on the merits of its takings claim and its substantive due process claim, this *Dataphase* factors weighs in favor of granting a preliminary injunction.

## C.       PLAINTIFFS HAVE SUFFERED AND WILL CONTINUE TO SUFFER CONSIDERABLE, IRREPARABLE HARM WITHOUT INJUNCTIVE RELIEF.

Plaintiffs have suffered and will continue to suffer irreparable harm from the Ordinance unless and until the Court grants injunctive relief.  The denial of a constitutional right is *per se* irreparable harm.  *Elrod v. Burns*, 427 U.S. 347, 373 (1976) ("[Loss of

29

constitutional] "freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury"); *Pavek v. Simon,* 467 F. Supp. 3d 718, 754 (D. Minn. 2020) (aggregating cases where United States Supreme Court, Eight Circuit, and Fourth Circuit recognized that a violation of a constitutional right is an irreparable harm); *Northshor Experience, Inc. v. City of Duluth*, 442 F. Supp. 2d 713, 719 (D. Minn. 2006); 11A CHARLES ALAN WRIGHT, ARTHUR R. MILLER & MARY KAY KANE, Fed. Prac. & Proc. Civ. § 2948.1 (3d ed.) (aggregating cases). As set forth above, Defendant has imposed significant restrictions on Plaintiffs' fundamental property rights amounting to an unconstitutional taking of Plaintiffs' property and deprived Plaintiffs of these rights through an Ordinance that subjects Plaintiffs to significant penalties, including criminal prosecution, loss of rental license, fines, and other damages.

## D.   BALANCE OF HARMS FAVORS INJUNCTIVE RELIEF.

Because Plaintiffs are challenging the constitutionality of the Ordinance, once Plaintiffs have established likelihood of success, the balance of harms favors the entry of an injunction because the government suffers no harm by enjoining enforcement of an invalid law. *Bank One, Utah*, 190 F.3d at 847-48. The loss of Plaintiffs and other Owners' constitutional freedoms substantially outweighs whatever alleged harm Defendant might suffer from the issuance of an injunction. Accordingly, this *Dataphase* factor also weighs in favor of granting injunctive relief.

E.      **PUBLIC POLICY SUPPORTS INJUNCTIVE RELIEF.**

"[P]ublic interest will perforce be served" by enjoining enforcement of an invalid law.  *Id.*  Because Plaintiff's claims are based on rights protected by the United States and Minnesota Constitution, this factor is dependent on the determination of the likelihood of success on the merits, because it is always in the public's best interest to protect constitutional rights.  *Kirkeby v. Furness*, 52 F. 3d 772, 775 (8th Cir. 1995).  Because Plaintiffs have established they are likely to succeed on the merits of their claims, this final *Dataphase* factor also weighs in favor of granting injunctive relief.

## IV.   <u>CONCLUSION</u>

As set forth above, all of the *Dataphase* factors weigh in favor of granting injunctive relief.  Accordingly, Plaintiffs respectfully request that the Court grant their Motion for Preliminary Injunction to enjoin Defendant from enforcing the Ordinance until this litigation is resolved.

COZEN O'CONNOR

*/s/ Mark Jacobson*
Mark Jacobson (#0188943)
E-mail: mjacobson@cozen.com
Steven Katkov (#0202769)
E-mail: skatkov@cozen.com
Cassandra M. Jacobsen (#0400120)
E-mail: cjacobsen@cozen.com
33 South Sixth Street, Suite 3800
Minneapolis, MN 55402
Telephone: 612.260.9000

31

Calli Padilla (PA #312102)
(admitted *pro hac vice*)
E-mail: cpadilla@cozen.com
1650 Market Street, Suite 2800
Philadelphia, PA 19103
Telephone: 215-665-2000

*Attorneys for Plaintiffs*

Dated:   February 12, 2021