# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MINNESOTA

Lamplighter Village Apartments LLLP, 1023 Grand Avenue LLC, 1708 and 1712 Grand Avenue LLC, 1947 Grand Avenue LLC, 231 Dayton Avenue LLC, 707 and 711 Grand Avenue LLC, Alton-HRG, LLC, Alton-NFLP, LLC, Alton-SHN, LLC, Highland Ridge, LLLP, Lucas Goring, Madison LLC, Minnehaha Avenue Apartments, LLC, Oaks Union Depot LLC, Oxford Apartments LLC, Plaza, LLLP, Rockwood Place, LP, Wellington-NFLP, LLC, Wellington-PFP, LLC, Wellington-SHN, LLC, Woodstone Limited Partnership, and Yea Thao,

  Plaintiffs,

v.

CITY OF ST. PAUL,

  Defendant.

CIVIL ACTION NO. _____

**DECLARATION OF LEANNA STEFANIAK IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION**

I, Leanna Stefaniak, hereby declare as follows:

1. I am the Chief Real Estate Officer and General Counsel of At Home Apartments, L.L.C. ("At Home Apartments").

2. At Home Apartments is the management company for Plaintiff Minnehaha Avenue Apartments, LLC ("Minnehaha").

3. Minnehaha is a Minnesota limited liability company that owns nine (9) residential dwelling units and one (1) commercial unit located at 1522 Grand Avenue in St. Paul, Minnesota.

4. I, along with other At Home Apartments personnel, am responsible for screening potential tenants who seek to rent a Minnehaha residential unit.

5. Leasing Minnehaha's property is an act that comes with serious risks. It involves giving up much of Minnehaha's own interest in its property and grants a tenant the exclusive right to possess its property during the term of the tenancy.

6. A tenant who is in exclusive possession of Minnehaha's property may significantly damage the premises, which is time-consuming and expensive to remediate. The costs of remediating this damage often far exceed the amount of any security deposits. Tenants may also be unstable, dishonest, or disruptive, and they may pose a danger to the personal safety of other tenants and management or building maintenance staff and disrupt other tenants' quiet enjoyment of the property.

7. A proceeding to evict this type of tenant can be time consuming and extremely costly. While we handle some evictions in-house, others may require engaging outside legal counsel, given the nature of a lease and rights afforded residential tenants.

An eviction of one tenant can cost several thousand dollars in costs and fees, not including the time and attention necessary to see the process through.

8. In my experience, tenants remain in the property while the eviction case is pending, causing unpaid rents to continue to mount, along with the possibility of further damage to the premises during the eviction process. The owner rarely recovers unpaid rents or reimbursement of damage caused to the property. It is generally extremely difficult to satisfy a judgment against an evicted tenant.

9. At Home Apartments and Minnehaha also have a duty to address and prevent instances of disruptive criminal and nuisance conduct in Minnehaha's rental properties.

10. At Home Apartments therefore takes great care to create and implement screening policies and procedures to limit these risks and ensure that it is excluding those individuals who will not uphold a safe, comfortable, and crime-free living environment in Minnehaha's property.

11. At Home Apartments utilizes predictive factors that are objectively applied to qualify potential tenants.

12. Specifically, we look at an applicant's criminal background check, credit report, rental history, and income to determine whether that applicant is likely to be a successful tenant for Minnehaha's property.

13. As an owner of residential dwelling units in St. Paul, Minnehaha is subject to St. Paul Ordinance 20-14 (the "Ordinance").

14. The Ordinance will change the way At Home Apartments screens applicants on behalf of Minnehaha in several critical respects, and we are extremely concerned about how those changes will affect Minnehaha's rental property and its business.

15. As noted above, At Home Apartments runs a criminal background check on all applicants to locate any prior criminal convictions the applicant may have.

16. Currently, if a criminal background check shows that an applicant was convicted of a crime, we evaluate the severity of the crime, the amount of time since the crime occurred, and the history of recidivism, including whether the applicant committed multiple lower level crimes in a short period of time, to determine whether to rent to that applicant. We look specifically for criminal convictions involving a threat of violence to a person or property, such as domestic abuse or assault. We reject applicants with a criminal record inconsistent with this screening criteria.

17. Based on our experience, we believe that prior criminal conduct can be predictive of disruptive conduct or the lack of stability necessary to meet ongoing lease obligations.

18. Rejections are made out of concern for the safety of other tenants and employees, and because a criminal record is an indicator of the likelihood of lease compliance – safe and quiet enjoyment of the premises, taking care of the leased premises, timely payment of rent, and allowing other tenants to enjoy their units and common spaces.

19. Under the Ordinance, we will have to change those set guidelines to allow for approvals of applicants who have committed serious crimes and often been recently incarcerated for those crimes.

20. For example, we will be forced to rent to an applicant who was convicted of a felony for a serious offense against a person, such as homicide, manslaughter, kidnapping, or assault, so long as that individual was sentenced (a date that is not clear from reading the Ordinance) for that crime more than ten (10) years prior to the application, even if that applicant was only recently released from prison.

21. By way of another example, we will be forced to rent to an applicant who was convicted of a felony for rape, so long as that individual was sentenced for that crime more than seven (7) years prior to the application, even if that applicant was only recently released from prison.

22. We will also be required to rent to an applicant who was convicted of a misdemeanor for a sex crime, including sexual assault or prostitution, so long as that individual was sentenced for that crime more than three (3) years prior to the application.

23. Furthermore, we will be required to rent to an applicant who was convicted of numerous misdemeanors involving violence against a person or property, so long as that individual was sentenced for all of those misdemeanors more than three (3) years prior to the application.

24. Renting to individuals with these types of serious criminal records is extremely concerning for At Home Apartments, Minnehaha, and our employees. It puts our other tenants and our employees in danger and makes it more difficult for us to prevent the commission of crimes or other concerning behaviors on Minnehaha's property.

25. We also run a credit history report on applicants. We obtain a credit report from a third-party agency that includes results predictive of consumers' likelihood of

defaulting on their obligations and rely on that report in our overall evaluation of the applicant.

26. Under the Ordinance, we can still run a credit report, but we cannot look to the applicant's credit score or lack of credit history to make a determination as to whether that applicant will be able to pay his or her rent.

27. We also run a rental history search on applicants to determine whether the applicant has any prior evictions or anything else on his or her record that would be concerning to us, such as damaging the premises or posing a threat to other tenants, management, maintenance, employees, and/or a threat to other tenants' quiet enjoyment of their residences.

28. We do so because successful prior tenancy is probative of future success as a tenant in one of Minnehaha's units – safe and quiet enjoyment of the premises, taking care of the leased premises, and timely payment of rent.

29. Currently, if an applicant has negative references or a history of evictions on his or her record, the applicant is denied.

30. Under the Ordinance, however, we will no longer be able to reject an applicant for certain information obtained in the rental history search. If an applicant has an eviction less than three years old and there was no judgment issued, we must rent to that applicant. If an applicant has an eviction more than three years old, we must rent to that applicant.

31. Finally, we seek information about the applicant's income, as that information determines whether the applicant would be able to afford the required rent payment and is often a reason a tenant stops paying rent.

32. A risk of leasing is that individuals, on occasion, desire an apartment beyond their means, cannot control their finances, and/or suffer adverse financial circumstances during the lease. In those circumstances, tenants may default or may be repeatedly delinquent in meeting their lease payments.

33. We therefore currently utilize a minimum income test requiring income equal to two and a half times the rent or higher. If an applicant does not meet this test, the applicant will be rejected.

34. Under the Ordinance, however, we must rent to an applicant who does not meet this test, as long as that applicant can demonstrate a successful payment of rent with an income less than two and a half times the rent. This puts Minnehaha at financial risk of tenants with a lower income not having the ability to pay the required rent.

35. Despite the application of carefully-crafted screening criteria, a tenant to whom we decide to lease may nevertheless fail to meet certain lease obligations.

36. In those circumstances, where the lease is about to expire, we may choose to elect our contractual right not to renew the lease, rather than evict the tenant. This option benefits us because we do not have to undergo the expensive and time-consuming eviction process and benefits the tenant because the tenant similarly does not have to undergo the eviction process and will not have an eviction on his or her record when seeking future housing arrangements.

37. We have routinely opted to non-renew a number of our tenants and have thus avoided the need to evict those tenants.

38. The Ordinance will severely hinder our ability to non-renew a lease.

39. For example, a tenant may cease paying rent or routinely fail to pay rent on time. When the lease is close to expiration, we will simply elect not to renew that tenant's lease.

40. Under the Ordinance, however, we will be required to first give the non-paying tenant notice of non-payment and a chance to cure their deficiency, or institute eviction proceedings against the tenant.

41. Where the tenant routinely pays rent late, we will be required to give the late-paying tenant notice of late payment and an opportunity to make additional timely payments. This all comes with no assurances of future timely, full rental payments.

42. Tenants may also cause damage to the property, and/or become a nuisance to other tenants in the property, putting them in material breach of their lease obligations. Again, when the lease is close to its expiration, we will simply elect not to renew that tenant's lease.

43. Under the Ordinance, however, we will be required to give the breaching tenant written notice and an opportunity to cure the breach. We can only seek not to renew the lease where the tenant continues the same conduct after notice and opportunity to cure. Again, this comes with no assurances that the tenant will comply with lease obligations going forward.

44. By way of further example, we may decide not to renew a lease if the property at issue needs to be rehabilitated or renovated, which renders the property uninhabitable during the duration of the rehabilitation or renovation, or if the government orders the building be vacated.

45. Under the Ordinance, in these circumstances, we will be required to provide ninety (90) days' written notice to the tenant along with a relocation assistance payment, in an amount dictated by the City.

46. The Ordinance completely eviscerates our ability to terminate a lease at the natural expiration of the leasehold, unless we can meet certain requirements dictated by the City.

47. The cumulative effect of these prohibitions severely cripples our ability to rent to the applicants to whom we want to rent in order to avoid housing problem tenants in Minnehaha's property. It forces us to lease to tenants presenting a higher risk to other tenants, to tenants who may cause damage to Minnehaha's property, and to tenants who may default on their rent obligations. And, after being required to rent to a problematic tenant, our ability to non-renew that tenant's lease at our discretion will be completely eviscerated. We fully expect that these requirements will increase the number of evictions in our property, as well as those throughout St. Paul.

48. In addition, these provisions make it more cumbersome and expensive to empty buildings for rehab and repair, which makes it less likely that Minnehaha and other owners will rehab and repair buildings, even where there is a need to do so. This will diminish the quality of rental housing stock in St. Paul.

49. At Home Apartments and Minnehaha are also concerned that the Ordinance will significantly impact Minnehaha's finances and economic viability.

50. On the one hand, we are concerned that compliance with the Ordinance will cause an increase in the costs incurred in renting Minnehaha's property. We believe that being forced to rent to individuals with a serious criminal history will lead to increased property damage, which will cost money to fix. Increased costs leads to increased rents for all tenants across Minnehaha's units.

51. In that same vein, being forced to rent to individuals with poor credit history, poor rental history, and/or lower income will lead to a higher default rate. A high rate of default is economically devastating to Minnehaha.

52. Moreover, the Ordinance interferes with Minnehaha's investment-backed expectations and diminishes the overall economic value of its property.

53. Minnehaha expects to make money on the rental payments from the tenants to whom the property is rented. It expects to have the ability to select these tenants, on a non-discriminatory basis, and assess tenants on factors relevant to their ability to carry out the leasehold requirements. Those were the expectations Minnehaha had when it purchased the property. Taking this right away from Minnehaha interferes with the expectations on which Minnehaha has made its investment in the property.

54. Minnehaha is concerned that if we do not fully comply with the Ordinance, we will be subject to serious penalties, including criminal prosecution. We may also lose our rental license and be subject to administrative fines, restrictions, or other penalties.

I declare under penalty of perjury that the foregoing is true and correct.

_____
Leanna Stefaniak

Executed on: February 11, 2021