UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| Lamplighter Village Apartments LLP; 1023 Grand Avenue LLC; 1708 and 1712 Grand Avenue LLC; 1947 Grand Avenue LLC; 231 Dayton Avenue LLC; 707 and 711 Grand Avenue LLC; Alton-SHN, LLC; Alton-NFLP, LLC; Alton-HRG, LLC; Highland Ridge, LLLP; Lucas Goring; Madison LLC; Minnehaha Avenue Apartments, LLC; Oaks Union Depot LLC; Oxford Apartments LLC; Plaza, LLLP; Rockwood Place, LP; Wellington-NFLP, LLC; Wellington-PFP, LLC; Wellington-SHN, LLC; Woodstone Limited Partnership; and Yea Thao; | Civ. No. 21-413 (PAM/HB) |
| Plaintiffs, | |
| v. | **MEMORANDUM AND ORDER** |
| City of St. Paul, | |
| Defendant. | |

This matter is before the Court on Plaintiffs' Motion for a Preliminary Injunction. (Docket No. 27.) For the following reasons, the Motion is granted.

**BACKGROUND**

Plaintiffs are 19 rental property owners in the City of St. Paul. On July 8, 2020, the St. Paul City Council enacted an ordinance granting extensive protections to tenants and governing how landlords conduct their business. Ord 20-14 § 193. The ordinance took effect on March 1, 2021.

A.     **The Ordinance**

The ordinance requires landlords to employ certain screening criteria and constrains both their ability to sell their property and to terminate leases, and includes various other restrictions.

1.     **Screening Criteria**

The ordinance prohibits landlords in the City of St. Paul from considering factors such as vacated or expunged convictions, id. §193.04(b)(1)(c); misdemeanor convictions for which the date of sentencing is more than three years old, id. § 193.04(b)(1)(h); and certain felony convictions for which the dates of sentencing are more than a certain number of years old, id. § 193.04(b)(1)(i)-(j). The screening-criteria subsection also provides that a landlord cannot decline to rent to a tenant solely because of that tenant's credit history, although "a landlord may use credit report information to the extent the report demonstrates a failure to pay rent or utility bills." Id. §193.04(b)(2)(a). Finally, this subsection prohibits landlords from considering certain rental history and from refusing to rent to individuals with income less than two-and-a-half times the rent if the prospective tenant "can demonstrate a history of successful rent payment with the same or lower ratio of income to rent." Id. § 193.04(b)(3)(d).

2.     **Security Deposits**

The security-deposit subsection limits landlords from requiring more than one month's rent as a security deposit. Id. § 193.03(a). However, landlords may require one month's prepaid rent, id. § 193.03(b), and collect one additional month's rent if the applicant would otherwise be disqualified based on the ordinance's screening criteria. Id.

2

§ 193.04(d).

### 3. Just-Cause Notice

The ordinance permits a tenant to extend a lease in perpetuity, unless a landlord "can prove in court that Just Cause exists." Id. § 193.05(b). For the purpose of this Motion, "just cause" consists only of on non-payment of rent, after the opportunity to cure the deficiency; late payment for five out of twelve consecutive months; or material non-compliance with the lease, after notice the opportunity to cure the deficiency.

### 4. Advance Notice of Sale and Ownership Change

This subsection requires that owners seeking to sell their property provide written notification to the Director of the Department of Planning and Economic Development and all tenants at least 90 days before the property is available for sale, and mandates specific language that owners must use to communicate that notice. Id. § 193.06. Additionally, a new owner has 30 days to provide all tenants with written notification of any ownership change. Id. § 193.08.

### 5. Penalties

A violation of the ordinance is punishable by a fine, adverse rental-license action, and criminal prosecution. Id. § 193.09(a). If a landlord terminates a lease without meeting the ordinance's requirements for doing so, the landlord may be liable in a civil suit for "damages equal to Relocation Assistance under Sec. 193.07(b)[1], costs of suit or arbitration,

---

[1] Relocation assistance consists of a payment "equal to three times the rental house affordability limit at sixty (60) percent of the Area Median Income for the Twin Cities metro area as published by the Metropolitan Council." Id. § 193.01(12).

3

and reasonable attorney's fees." Id. § 193.09(b).  Tenants "may seek redress in any court of competent jurisdiction" to enforce the ordinance.  Id.

**B.     Plaintiffs' Claims**

Plaintiffs contend that the ordinance violates their rights under the United States and Minnesota Constitutions.  Specifically, they claim that the ordinance operates as a taking, deprives them of their right to substantive and procedural due process, constitutes compelled speech in violation of the First Amendment, impairs their contractual relationships, and is void for vagueness.  They seek a preliminary injunction for the alleged violations of the Takings Clause and substantive due process.

**DISCUSSION**

A preliminary injunction is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief."  Winter v. Natural Res. Def. Council, Inc., 555 U.S. 7, 22 (2008).  When deciding whether to issue a preliminary injunction, courts consider four factors: (1) the threat of irreparable harm to the movant; (2) the balance of harm the injunction would have on the movant and the opposing party; (3) the probability that the movant will succeed on the merits; and (4) the public interest. Dataphase Sys., Inc. v. CL Sys., Inc., 640 F.2d 109, 113 (8th Cir. 1981).  While no factor is dispositive, "the absence of a likelihood of success on the merits strongly suggests that preliminary injunctive relief should be denied."  Barrett v. Claycomb, 705 F.3d 315, 320 (8th Cir. 2013).

A.     **Likelihood of Success on the Merits**

To demonstrate a likelihood of success on the merits of their claims, Plaintiffs must establish that they have a "fair chance of prevailing" on those claims. Planned Parenthood of Minn., N. Dak., S. Dak. v. Rounds, 530 F.3d 724, 732 (8th Cir. 2008) (en banc). This standard does not require "the party seeking relief [to] show 'a greater than fifty percent likelihood that [it] will prevail on the merits.'" Id. at 731 (quoting Dataphase, 640 F.2d at 113). And if the other three factors "strongly favor[] the moving party," then "a preliminary injunction may issue if movant has raised questions so serious and difficult as to call for more deliberate investigation." Dataphase, 640 F.2d at 113.

1.     **Takings**

Both the federal and Minnesota constitutions prohibit the government from taking property "for public use, without just compensation."  U.S. Const. Amend. V. "[G]overnment regulation of private property may, in some instances, be so onerous that its effect is tantamount to a direct appropriation or ouster." Lingle v. Chevron U.S.A. Inc., 544 U.S. 528, 537 (2005). However, "government regulation—by definition—involves the adjustment of rights for the public good." Andrus v. Allard, 444 U.S. 51, 65 (1979). Thus, the Supreme Court has "stake[d] out two categories of regulatory action that generally will be deemed per se takings for Fifth Amendment purposes." Lingle, 544 U.S. at 538. The first category involves a "permanent physical invasion" of property, no matter how minor. Id. The second "applies to regulations that completely deprive an owner of 'all economically beneficial us[e]' of her property." Id. (quoting Lucas v. South Carolina Coastal Council, 505 U.S. 1003 1019 (1992) (emphasis in Lucas)).

5

Plaintiffs emphasize the permanent-physical-invasion category. "[A] permanent physical occupation authorized by government is a taking without regard to the public interests that it may serve." Loretto v. Teleprompter Manhattan CATV Corp., 458 U.S. 419, 426 (1982). Plaintiffs argue that the ordinance interferes with their right to exclude others, which they maintain is "perhaps the most fundamental of all property interests." Lingle, 544 U.S. at 539. Before the ordinance went into effect, every Plaintiff applied more rigorous screening criteria than that which the ordinance dictates. (Pls.' Supp. Mem. (Docket No. 29) at 14.) Therefore, the ordinance mandates that owners rent to tenants whom they would otherwise reject for concerns regarding potential default, property damage, or safety of tenants and other individuals on the property. Moreover, Plaintiffs argue that the ordinance's creation of tenants' right to renew their leases in perpetuity, absent narrow just-cause circumstances, constitutes a permanent physical invasion of their property.

While Defendant asserts that the ordinance does not interfere with an owner's ability to evict tenants, Defendant overlooks the significant restrictions that the ordinance places on landlords. Plaintiffs explain that they often prefer to simply not renew a lease rather than evict a tenant, but the ordinance requires that they pursue an expensive and drawn-out eviction process to end a tenancy absent a just-cause exception. (Pls.' Supp. Mem. at 7, 17.)

The Takings Clause's purpose is "to bar Government from forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole." Armstrong v. United States, 364 U.S. 40, 49 (1960). Plaintiffs claim that the

6

ordinance operates as a per se taking because it singles out private landlords "to address a perceived, though vaguely identified, societal problem" related to housing needs. (Pls.' Supp. Mem. at 16.) The Court agrees. Plaintiffs have demonstrated a possible likelihood that they will succeed on the merits of their per se takings claim. See Planned Parenthood of Minn., 530 F.3d at 731-32.

To determine whether the ordinance operates as an unconstitutional regulatory taking, the Court uses standards set forth in Penn Central Transportation Company v. New York City, 438 U.S. 104 (1978). Under Penn Central, "several factors have particular significance," including the "economic impact of the regulation on the claimant and, particularly, the extent to which the regulation has interfered with distinct investment-backed expectations." Penn Central, 438 U.S. at 124. The "character of the governmental action" is also relevant, "for instance whether it amounts to a physical invasion or instead merely affects property interests through 'some public program adjusting the benefits and burdens of economic life to promote the common good.'" Lingle, 544 U.S. at 539 (quoting Penn Central, 438 U.S. at 124). Ultimately, the Court must determine whether the regulatory action is "functionally equivalent to the classic taking in which government directly appropriates private property or ousts the owner from his domain." Id. To do so, the Court "focuses directly upon the severity of the burden that government imposes upon private property rights." Id. Thus, "the Penn Central inquiry turns in large part, albeit not exclusively, upon the magnitude of a regulation's economic impact and the degree to which it interferes with legitimate property interests." Id. at 540.

Plaintiffs assert that the ordinance constitutes a regulatory taking under Penn Central due to its economic impact and because it abrogates their fundamental right to exclude others from their property. (Pls.' Supp. Mem. at 21-22.) As with their per se taking argument, Plaintiffs contend that the ordinance violates their Fifth Amendment rights because the mandatory screening criteria require landlords to rent to individuals whom they would otherwise exclude from their properties and because it allows tenants to remain in the rental unit indefinitely. (Id. at 19.)

Moreover, Plaintiffs contend that the ordinance interferes with their investment-backed expectations and "exposes them to significant economic risk." (Id. at 22.) Undoubtedly this ordinance comes at a heavy cost for owners because the screening criteria mandates, for example, that they rent to tenants with less stable financial situations, prohibits owners from collecting additional upfront funds to mitigate risk of rent nonpayment, and permits tenants who are repeatedly late with rent payments to renew their lease indefinitely. The ordinance forces Plaintiffs to bear society's burden related to housing needs. Plaintiffs have shown a probable likelihood of success on the merits of their regulatory takings claim.

### 2.    Substantive Due Process

Plaintiffs further argue that the ordinance deprives them of the fundamental right to exclude others from their properties without due process, violating the Fourteenth Amendment of the United States Constitution and Article 1, Section 7 of the Minnesota Constitution. Fundamental rights, for purposes of the Due Process Clause, are those rights "objectively, deeply rooted in this Nation's history and tradition." Washington v.

Glucksberg, 521 U.S. 702, 721-21 (1997).  Indeed, the right to exclude others from one's property is fundamental.  Kaiser Aetna v. United States, 444 U.S. 164, 179 (1979).  Therefore, Plaintiffs argue that the ordinance must pass strict scrutiny—it must be narrowly tailored to serve a compelling governmental interest.

Defendant fails to address Plaintiffs' argument that the right to exclude others is fundamental, and instead argues that the right to rent has not been established as fundamental and thus strict scrutiny does not apply.[2]

As Plaintiffs argue, the ordinance contains no proposition that criminal records of a certain age, poor credit ratings, or adverse credit histories impedes St. Paul residents from securing housing that they could otherwise afford. (Pls.' Supp. Mem. at 27.)  The ordinance thus fails to pass the exacting requirements under a strict-scrutiny analysis.

Likewise, the ordinance fails to pass the rational-basis test.  The ordinance mentions barriers that contribute to challenges in securing housing, but does not indicate that the ordinance will accomplish the City's enunciated objectives.  As Plaintiffs highlight, the author of the study on which the City relied in creating the ordinance stated that it is unknown whether the study's findings apply to the wider rental population, not solely individuals with criminal records residing in group-housing facilities with support services. (Id. at 28.)  Moreover, while the ordinance references racial disparities, that concern is

---

[2] Defendant compares St. Paul's ordinance here to the Minneapolis ordinance at issue in 301, 712, 2103 & 3151 LLC v. City of Minneapolis, No. 20cv1904, 2020 WL 6537526, at *5 (D. Minn. Nov. 6, 2020), but Minneapolis's ordinance is inapposite.  (Def.'s Opp'n Mem. (Docket No. 47) at 22-23.)

addressed by the Fair Housing Act, which prohibits race-based housing discrimination. Plaintiffs have demonstrated a likelihood of success on the merits regarding their substantive due process claim.

**B.     Irreparable Harm**

A court must also consider whether a Plaintiff seeking a preliminary injunction will suffer irreparable harm absent the injunction. Dataphase, 640 F.2d at 113. Defendant argues that Plaintiffs fail to show irreparable harm because they filed this this lawsuit on February 12, 2021, even though the ordinance was enacted in July 2020. (Def.'s Opp'n Mem. (Docket No. 47) at 2.) Plaintiffs assert that they waited to file suit because the ordinance states that an "Implementation Task Force" would create rules and an implementation plan, and Plaintiffs were waiting for such guidance. Id. § 193.13. When Plaintiffs realized that the Task Force would not offer such guidance before the ordinance was to take effect on March 1, 2021, they filed this lawsuit. (Pls.' Reply Mem. (Docket No. 49) at 11.) Plaintiffs' timing in filing the lawsuit was reasonable based on the ordinance's promise of further instruction.

Plaintiffs have established the existence of irreparable harm because continued enforcement of the ordinance is likely to result in ongoing violations of Plaintiffs' constitutional rights, and "loss of [constitutional] freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." Elrod v. Burns, 427 U.S. 347, 373 (1976).

**C.     Balance of Equities and the Public Interest**

When the validity of a statute or ordinance is involved, the balance of equities and public interest do not weigh in the Court's analysis. See Bank One, Utah v. Guttau, 190 F.3d 844, 847-48 (8th Cir. 1999).

**D.     Bond**

A court may issue a preliminary injunction "only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." Fed. R. Civ. P. 65(c). While Defendant requested a "substantial" bond, it did not specify an amount or provide any legal justification for such an amount. (Def.'s Opp'n Mem. at 33.) The Court finds that Plaintiffs' request of a $1 security bond is appropriate, because Defendant will not be harmed by an injunction against an ordinance that is likely to violate citizens' constitutional rights. See Fed. R. Civ. P. 65(c).

**CONCLUSION**

Accordingly, **IT IS HEREBY ORDERED that:**

1.   Plaintiffs' Motion for a preliminary injunction (Docket No. 27) is **GRANTED**;

2.   Defendant is **ENJOINED** from enforcing St. Paul Ord 20-14 § 193 pending a trial on the merits of Plaintiffs' claims; and

11

3. Under Rule 65(c), to secure the issuance of this injunction, Plaintiffs must post a bond in the amount of $1 within five business days of the date of this Order.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**

Dated: Monday, April 19, 2021

*s/ Paul A. Magnuson*
Paul A. Magnuson
United States District Court Judge